SOUTH TEXAS PUBLIC SERVICE CO. et al. v. JAHN et al.    (No. 7198.)

Court of Civil Appeals of Texas. Austin.
April 4, 1928.

Rehearing Denied June 13, 1928.

1. **Municipal corporations** ⟨⟩225(3)—City held without power to sell electric street lighting system without submitting question to electorate (Rev. St. 1925, art. 1112).

City held not to have power to sell electric street lighting system without submitting question to electorate, since Rev. St. 1925, art. 1112, requires submission and refers to all municipally owned systems, not being limited to those which are revenue-producing.

2. **Municipal corporations** ⟨⟩225(3)—Statute held to authorize city to incumber any municipally owned water or light system (Rev. St. 1925, art. 1111).

Rev. St. 1925, art. 1111, granting to cities and towns power to mortgage and incumber light or water systems and franchise and income thereof, held to cover any character of municipally owned water or light system; those supplying only municipal needs and operated without revenue from city not being excluded, in view of article 1113.

3. **Municipal corporations** ⟨⟩225(3)—Statutory inhibition against selling municipally owned light plant without consent of electorate applies to plant free from incumbrance (Rev. St. 1925, art. 1112).

Inhibition of Rev. St. 1925, art. 1112, against selling municipally owned light plant without consent of electorate, applies equally to those free from incumbrance as to those incumbered.

4. **Evidence** ⟨⟩25(2)—It is common knowledge that many municipalities have owned water and light plants which supplied only municipal needs.

It is matter of common knowledge that many cities and towns have owned water or light plants which have supplied only municipal needs, such as street, park, and public building lighting, and fire protection and sanitation.

5. **Municipal corporations** ⟨⟩272—Furnishing water and lights for municipal purposes is "municipal function," but furnishing light, power, and water to private inhabitant consumers requires legislative grant.

It is clearly a proper "municipal function" for city to supply water and lights for municipal purposes, but furnishing of light, power, and water to private inhabitant consumers requires legislative grant, express or implied.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Municipal Function.]

6. **Municipal corporations** ⟨⟩225(3)—Method by which city acquired light plant held not subject of proper inquiry, in determining power to sell without consent of electorate.

Method by which city originally acquired light plant held not subject of proper inquiry, in

determining power to sell plant without consent of electorate, after plant had been in operation for 15 years without objection.

**7. Municipal corporations ⟳272—City may make reasonable profit on light system; private consumers not being entitled to complain, if rates are reasonable.**

City may make reasonable profit on its water or light system, and private consumers cannot complain, so long as rates charged are reasonable; and their reasonableness is determined from viewpoint of commensuration with service rendered.

**8. Municipal corporations ⟳225(3)—That light system was operated from revenues of waterworks plant gave no authority to sell light system without submission of question to electorate (Rev. St. 1925, art. 1112).**

Fact that municipally owned light system was being operated from revenues of waterworks plant *held* to afford no authority to sell light system without submission of question to electorate, as required by Rev. St. 1925, art. 1112, that was not otherwise possessed.

**9. Municipal corporations ⟳886—City's profit on water or light system becomes part of general revenue.**

Profits to city on water or light system *held* to become part of general revenue.

**10. Municipal corporations ⟳993(2)—Taxpayers held entitled to maintain suit against city to cancel contract for sale of lighting system made without submitting question to electorate (Rev. St. 1925, art. 1112).**

Taxpaying citizens of city *held* to have right to maintain suit to cancel contract between city and service company for sale of electric street lighting system, on ground that question was not submitted to electorate as required by Rev. St. 1925, art. 1112.

On Motion for Rehearing.

**11. Municipal corporations ⟳225(3)—City, owning light or water plant, may place stipulation in incumbrance agreement requiring payment into separate fund of reasonable charge for services it receives from system (Rev. St. 1925, arts. 1111, 1114).**

City, owning light or water plant, may place stipulation in incumbrance agreement whereby it will be required to pay into separate fund reasonable charge for services it receives from system, to be applied to interest and provide sinking fund for principal of incumbrance debt, and stipulation for franchise embodying right to collect such reasonable charge from city, to be exercised by purchaser in case of sale under incumbrance.

Appeal from District Court, Comal County; M. C. Jeffrey, Judge.

Suit by R. S. Jahn and others against the South Texas Public Service Company and others. Decree for plaintiffs, and certain defendants appeal. Affirmed.

Henne & Fuchs, of New Braunfels, and Templeton, Brooks, Napier & Brown, of San Antonio, for appellants.

Adolph Seidemann, of New Braunfels, and Dibrell & Mosheim, of Seguin, for appellees.

McCLENDON, C. J. Jahn and others, taxpaying citizens of New Braunfels (referred to as the city), obtained a decree against the city, its mayor, commissioners, and South Texas Public Service Company (referred to as the service company), canceling a contract between the city and the service company, an ordinance ratifying it, and a bill of sale, whereby the former sold to the latter its electric street lighting system. The city and the service company have appealed.

The controlling facts (undisputed except where noted) follow:

In 1911, the city issued $67,000 of bonds "for the purpose of construction and extension of additions to the waterworks of said city." From the proceeds of this bond issue the city expended $7,272 in the construction of a street-lighting system, which it operated in conjunction with its waterworks system. This street-lighting system consisted of a dynamo, transformers, poles, and wires, and had been in continuous operation since its construction in 1912. The city did not supply private consumers. The service company, under a franchise from the city, supplied the inhabitants with electric light and power. On January 6, 1927, the city and service company entered into the contract in question, by which the city sold to the service company its entire street lighting system (the dynamo being excluded from the sale), consisting of poles, wires, etc., for the sum of $7,560 cash. By the same contract the service company agreed to furnish the city with lights for its streets and parks for a period of five years at a stated price per light per month, and to make specified additions to the street-lighting system when called upon by the city. For the first two-year period the city was to pay for the service designated a lump sum in advance of $7,560, and for any additional service and for the remaining three years payment was to be made monthly. It was shown that the entire expenses of operating the street lighting system under the city's administration was borne by the revenues from the waterworks plant. The contract was subject to approval by the service company's attorneys.

This suit was brought on May 31, 1927, and all defendants were served before August 22, 1927, on which day an ordinance was passed confirming the contract. A bill of sale was delivered by the city to the service company of the property covered by the contract, and the service company and the city exchanged checks for $7,560 each. The service company went into possession of the property, and has since been rendering the contracted-for service. The decree canceling the contract, ordinance, and bill of sale awarded to the service company the sum of $2,573 for service ren-

dered under the contract. This portion of the decree, however, is not questioned.

[1] The controlling issue is whether, under article 1112, R. S. 1925, the city had the power to sell its electric street-lighting system without submitting the question to the electorate. The pertinent language of the article reads:

"No such light or water system shall ever be sold until such sale is authorized by a majority vote of the qualified voters of such city or town."

Appellants contend that the word "such" limits the class of systems requiring for their sale the approval of the electorate to those which are revenue-producing and therefore capable of being incumbered. Appellees contend that "such" refers to the general class of systems legislated concerning, namely, those municipally owned. We sustain the latter view. Article 1112 was originally enacted as a part of section 6, chapter 112, Laws of 1911. In the 1925 codification the sections of this chapter with some omissions, rearrangement, and change in language are embraced in title 28, chapter 10, subdivision 2 (articles 1111–1118). The first portion of section 6 is omitted from the codification, and in the latter portion, which is brought forward as article 1112, immediately following original section 1 (article 1111), the language "no such system shall ever be sold" is changed in article 1112 to read, "no such light or water system shall ever be sold." The purpose of this omission and rearrangement is not apparent to us, but we attach to it no significance so far as the question before us is concerned; nor do we attach any significance to the added words, "light or water," in article 1112. Had it been the purpose of the codifiers to change the meaning expressed in the original act by limiting the class of systems embraced in the article 1112 below those contemplated in the latter portion of section 6, we feel sure that they would have used apt language to evidence such purpose.

[2] Article 1111 (original section 1) grants to cities and towns the "power to mortgage and incumber their light systems or water systems, either or both, and the franchise and income thereof," etc. This language is broad enough to cover any character of municipally owned water or light system. We do not think there is merit in the contention of appellants that a water or light system which supplies only municipal needs and is being operated without revenue from the city is excluded from the systems authorized in article 1111 to be incumbered. It may be conceded that as a practical proposition money could not be raised on such security, in the absence of a stipulation in the incumbrance agreement whereby the city would be required to pay into a separate fund a reasonable charge for the service it received from the system, to be applied to interest and provide a sinking fund for the principal of the incumbrance debt, and stipulation for a franchise embodying the right to collect such reasonable charge from the city, to be exercised by the purchaser in case of sale under the incumbrance. This subject is covered generally in the other provisions of subdivision 2 of chapter 10. There is nothing in the several articles which would deny to the city this power, and it is to be noted that authority to furnish free service is limited to "city public schools, or buildings and institutions operated by such city." Article 1113.

[3] We do not think this language, even under a liberal construction, embraces service for street lighting or general fire protection; but, even if so construed, it is not mandatory. Whether from a practical viewpoint a loan of this character could be floated would depend upon the revenue-bearing capacity of the system as compared with the amount of the loan. There is nothing in article 1111, or other related provisions, which would indicate that the systems referred to are only those which supply private consumers and are revenue-bearing at the time they are sought to be incumbered. If article 1111 is not limited to systems which serve private consumers, then clearly article 1112 is not so limited. The latter article is certainly as broad as the former. It is not even contended by appellants that the word "such" in article 1112 limits the systems therein mentioned to those which have been in fact incumbered. There would be no basis for such construction. The inhibition against selling a municipally owned plant without the consent of the electorate applies equally to those free from incumbrance as to those incumbered. The manifest purpose of the inhibition was to prevent disposition of such plants, and a consequent change from municipal to private ownership, without consent of the electorate, and this regardless of whether the system was in fact incumbered.

[4, 5] It is a matter of common knowledge that many cities and towns have owned water and light plants, one or both, which supplied only municipal needs, such as street, park, and public building lighting, and fire protection and sanitation. These systems are a modern development. Originally at common law the supplying of water and lights for purely municipal purposes was not a municipal duty. But, while no duty may rest upon the municipality in that regard, it is clearly a proper municipal function, and whether express legislative authority to its exercise is necessary is a question upon which there is some disagreement among the courts of this country. Furnishing light, power, and water to private inhabitant consumers, however, rests upon a different basis, and requires a legislative grant, express or implied. See note, 61 L. R. A. 3 et seq.; Hyatt v. Williams, 148 Cal. 585, 84 P. 41. It

is generally held, however, that where a plant is authorized only for supplying municipal or otherwise limited uses, the municipality may sell excess power or water to private consumers. Austin v. Nalle, 85 Tex. 520, 22 S. W. 668, 960; Crouch v. McKinney, 47 Tex. Civ. App. 54, 104 S. W. 518 (writ of error denied). In view of the fact that plants for purely municipal needs were not uncommon, and of the frequency with which the powers of a city in regard to water and light systems have been brought in question before the courts, it seems manifest to us that the above-quoted language of article 1111 cannot, by any fair construction, be limited to systems supplying private consumers; nor by parity of reasoning can article 1112 be so limited.

Appellants contend for the power of the city to make the contract on two other propositions:

1. Because the system was originally acquired through illegal diversion of proceeds of waterworks bonds, and authority vested in the commission to dispose of the system to reimburse that fund; and

2. The system was being illegally operated from revenues derived from water consumers, and the commission had the power to right this wrong and dispose of the plant under the general power "to provide for lighting the streets."

R. S. art. 1015, § 29.

We do not find substantial merit in either of these propositions. Even if the commission were conceded the power to sell the plant to reimburse the waterworks fund, the contract on its face and its consummation show that this was not done or attempted. In substance, the sale was to the service company in consideration of specified services to be performed during a period of two years.

[6] Independently of this fact, however, we do not think the method by which the city originally acquired the plant was a subject of proper inquiry, in determining the power of the commission to sell without consent of the electorate, after the plant had been in operation for a period of 15 years without objection from any source. There was no showing that any one having a special interest in the proper application of proceeds of the bond issue had ever objected to the diversion, or that the sale was made at the instance or for the protection of any one so interested. The city's title to the plant was not questioned, and the method by which it was acquired was not pertinent to the inquiry whether its sale must be approved by the electorate.

[7, 8] In support of their proposition that the system was being illegally operated from revenues of the waterworks plant, appellants cite a number of cases holding that, in fixing reasonable and nondiscriminatory rates, service to a municipality must be valued upon

the same basis as like service to a private consumer. These cases all arose under statutes vesting in some board or commission the right to fix reasonable and nondiscriminatory rates. The municipality receiving the free service was not the owner of the plant. In some instances contracts for free service to a municipality were held not binding. Service Co. v. Utility Commissioners, 87 N. J. Law, 128, 93 A. 707; Billings v. Pub. Service Com., 67 Mont. 29, 214 P. 608; Woodburn v. Pub. Service Com., 82 Or. 114, 161 P. 391, L. R. A. 1917C, 98, Ann. Cas. 1917E, 996; In re St. Joseph Water Co. (Mo.) P. U. R. 1926B, 76; In re Augusta Water Dist. (Me.) P. U. R. 1925B, 234.

A different rule applies where the municipality owns the plant and the rates charged are not regulated by statutory restrictions or requirements. In such case it is quite generally held that a city may make a reasonable profit on its water or light system, and private consumers cannot complain so long as the rates charged are reasonable; and their reasonableness is determined from the viewpoint of commensuration with the service rendered. Twitchell v. Spokane, 55 Wash. 86, 104 P. 150, 24 L. R. A. (N. S.) 290, 133 Am. St. Rep. 1021, and case note; Gas. Co. v. Springfield, 292 Ill. 236, 126 N. E. 739, 18 A. L. R. 929.

[9] Such profits become a part of the general revenue. Bank v. Terrell, 78 Tex. 450, 14 S. W. 1003; Crouch v. McKinney, above. The reasonableness of the water rates charged by the city are not brought in question in this case, nor could they be, properly. But, should the rates be held unreasonable, either in a proceeding for that purpose or by the commission, the right of the commissioners to sell the light plant would not thereby be altered. The commissioners have the power, independently of any court action, to reduce the rates to an amount deemed by them reasonable, and to appropriate from the general revenue a sum representing the value of the service the city receives from the light plant, to make up any deficiency from the operation of the waterworks plant. A sale of the light plant will require appropriation from the general revenue to pay the service company under the contract, and there is no valid reason why a like appropriation could not be made, in the absence of such sale. The fact that the light system is being operated from revenues of the waterworks plant affords no authority in the commission to sell the light system which that body does not otherwise possess.

[10] The right of appellees to maintain the suit is questioned on the ground that they have no special interest in defeating consummation of the contract. We sustain appellees' right to sue upon the authority of Austin v. McCall, 95 Tex. 565, 68 S. W. 791; Terrell v. Middleton, 108 Tex. 14, 191 S. W. 1138, 193 S. W. 139; Id. (Tex. Civ. App.) 187

S. W. 367; Crampton v. Zabriskie, 101 U. S. 609, 25 L. Ed. 1070.

The trial court's judgment is affirmed.

Affirmed.

## On Motion for Rehearing.

[11] Appellants take issue with the statement in our original opinion to the effect that there is nothing in the several statutory articles under consideration that would deny the city the power to place "a stipulation in the incumbrance agreement whereby the city would be required to pay into a separate fund a reasonable charge for the services it received from the system to be applied to the interest, and provide a sinking fund for the principal of the incumbrance debt, and a stipulation for a franchise embodying the right to collect such reasonable charge from the city to be exercised by the purchaser in case of sale under the incumbrance."

In this connection it is contended that such stipulation would be in direct contravention of the provision in article 1111, to the effect that no such obligation shall ever be a debt of the city, and of the provision in article 1114, to the effect that the holder of such obligation "shall never have the right to demand payment of this obligation out of any funds raised or to be raised by taxation."

We think there is no conflict between these provisions and the stipulation referred to in our opinion. The obligation referred to in the statutes is that secured by mortgage, and not the revenue to be derived from the plant. The purpose of the provisions referred to was manifestly to authorize the raising of money by bonds or mortgage which should be a charge only on the plant and its revenues.

It was not our purpose to define the powers of the city generally with reference to contracts for water and light. That it has the power to so contract at least for a limited period is well settled. The ability, however, of the city to bind itself in advance by contract for water and light has no bearing upon the mortgagability of such plant and the revenue to be derived therefrom. Revenue from private individuals would depend upon agreements between such individuals and the city, and the former would be free at any time to discontinue their patronage. The certainty or probable certainty of future revenues does not enter into the legal question of power of the city to mortgage, but concerns only the advisability of investing in such mortgage securities from a practical business standpoint.

If the plant served both the city for street lighting and individuals generally, clearly the entire plant could be mortgaged under the statute in question; nor is there serious question but that the city would have the power in its mortgage agreement to stipulate that no free service should be granted the city for lighting purposes, in which event it would be incumbent upon the city to pay into the revenues of the plant's operation a reasonable amount for the service so rendered it by the plant. If the other revenues from the plant's operation should be insufficient to pay the mortgage debt, then clearly the holders of the mortgage would have the right to require the city to pay into the operation fund the reasonable value of the service rendered it by the plant. This would not constitute the obligation secured by the mortgage a debt of the city, nor give the holders of such mortgage the right to demand payment of the mortgage out of funds raised by taxation. The right would be simply to require the city to pay into the operating fund of the plant the reasonable value of the service it received.

Motions for rehearing are overruled.

Overruled.