SAN ANTONIO INDEPENDENT
SCHOOL DISTRICT et al.,
Petitioners,

v.

CITY OF SAN ANTONIO, Respondent.

No. B-5950.

Supreme Court of Texas.

Dec. 31, 1976.

Rehearing Denied Jan. 26, 1977.

Ted Butler, Dist. Atty., Robert C. Storey, Asst. Dist. Atty., Harvey L. Hardy, San Antonio, for petitioners.

Crawford B. Reeder, City Atty., Matthews, Nowlin, MacFarlane & Barrett, Jon C. Wood, James D. Baskin, Jr., and W. Roger Wilson, San Antonio, for respondent.

REAVLEY, Justice.

This is an attack upon certain charges which the City of San Antonio exacts for gas and electricity sales by its municipally owned and operated system. The attack is made by these public entities which are major purchasers of gas and electricity from the City: San Antonio Independent School District and 11 other independent school districts in Bexar County, Bexar County Hospital District, and Bexar County. They assert that the City may not legally include in *their* utility charges any amount for payment to the general fund of the City. They also attack the automatic "fuel adjustment" charges assessed to them due to the increases in the cost of gas purchased by the City. Alternatively, they attack the portion of the automatic fuel adjustment charges which goes to the general fund of the City. They do *not* attack the total rate structure or contend that the City obtains an unreasonable return from its investment in these utilities.

The trial court, after a non-jury trial at which the facts or testimony were all stipu-

lated, held the payment to the City's general fund to be an illegal tax upon these consumers and also held the fuel adjustment charges to be invalid for lack of action by the City Council to adopt each individual increase. These charges were declared invalid and their collection was enjoined, and the trial court further awarded a monetary judgment for recovery of all money paid by reason of these charges within the four years preceding this suit.

The Court of Civil Appeals reversed the trial court's judgment and rendered judgment in all respects in favor of the City of San Antonio—denying all relief sought by the plaintiffs. Tex.Civ.App., 535 S.W.2d 671. We will affirm the judgment of the Court of Civil Appeals.

The City of San Antonio has owned its gas and electric systems since 1942. In order to finance the purchase of the systems and in accordance with Arts. 1111–1118, Vernon's Ann.Tex.Civ.Stat., the City entered into a Trust Indenture creating a lien on the properties and revenues of the systems for the benefit of the holders of the electric and gas revenue bonds. The management of these systems is placed in the hands of the five member Public Service Board of San Antonio. The City Council of San Antonio sets the rates charged for gas and electric service.

The Trust Indenture of February 1, 1951, is now in effect. Under Article V of this Indenture, as amended in 1961, revenues of the systems are to be applied according to the following priority:

1. Operating expenses.
2. Principal and interest on the bonds.
3. Reimbursement to the City for the loss of taxes which it would receive were the systems privately owned.
4. Payment to Improvements and Contingencies Fund in the amount of 12½% of gross revenues.
5. Payment to the City as follows:
   After setting aside and providing for said minimum amount of 12½% of gross revenues of the Systems to be placed in said Fund as above specified, there shall be paid into the General Fund of the City, to the extent available from remaining revenues in the General Account as of the end of each fiscal year: (a) a sum sufficient to reimburse the City for all amounts paid to the Board during the year for gas and electric services of the Systems used by the City for municipal purposes during such fiscal year and to the extent such remaining funds are found to be sufficient, such reimbursements may be made currently in monthly installments; and (b) commencing February 1, 1960, and during the three fiscal years ending January 31, 1961, 1962 and 1963, a sum in cash which, when added to (1) the payment in lieu of taxes for the year as provided in Section 5 of Article V of this Indenture, (2) the amount of said reimbursements for electric and gas services during the year, and (3) the amount expended during the year for additions to the street and traffic lighting system, will amount to $6,508,000 for the year, and commencing with the fiscal year beginning February 1, 1963, and for each fiscal year thereafter, a sum in cash which, when added to the payments, reimbursements and expenditures for the year mentioned in (1) to (3), inclusive, in the next preceding sentence hereof, will total an amount equal to 14% of the gross revenues of the Systems for the current fiscal year.

After the above listed priorities, the Indenture provides for the payment of any remaining revenues in certain additional amounts to the Improvements and Contingencies Fund and then to the Surplus Fund.

## THE 14 PER CENT CLAUSE OF THE TRUST INDENTURE

The petitioners (San Antonio Independent School District et al.) complain first about the provision listed as number 5 above. It will be seen that, if revenues permit, the City is to receive annually, in services and in money, virtually 14 per cent of the gross revenues of the gas and electric systems. Part of this amount is a sum to

reimburse the City in lieu of ad valorem taxes that would be received if the systems were not municipally owned. And part of the amount is reimbursement of the amounts expended by the City for its own electric and gas services and also for traffic and street lighting facilities. Anything further paid under this clause of the Indenture will all be gain to the City.

Originally the City could not obtain anything from its own utility, so long as it was encumbered, except free service and payments in lieu of ad valorem taxes. Art. 1113. This was changed by the enactment in 1949 of Art. 1113a. This latter statute, as amended in 1953, provides as follows:

> Incorporated cities and towns having a population of ten thousand (10,000) or more . . . are hereby authorized to transfer to the general fund of the city or town and use for general or special purposes revenues (now on hand or hereafter received) of any municipally-owned utility system in the amount and to the extent as may be authorized or permitted in the indenture, deed of trust, or ordinance providing for and securing payment of revenue bonds . . . notwithstanding any prohibition contained in Article 1113 . . . . .

■ A city which owns and operates its own public utility does so in its proprietary capacity. *Boiles v. City of Abilene*, 276 S.W.2d 922 (Tex.Civ.App.1955, writ ref'd). It is apparent from the language of Art. 1113a that the city need not furnish the service at cost. The general rule is that the city is entitled to make a reasonable profit from its own utility system. *South Texas Public Service Co. v. Jahn*, 7 S.W.2d 942 (Tex.Civ.App.1928, writ ref'd); 12 McQuillin, Municipal Corporations (1970) § 35.37c. Petitioners argue that this rule does not apply where Arts. 1113 and 1113a are applicable. They construe these two statutes, when taken together with the Indenture

provision, to rule out a reasonable return based upon the City's investment. Thus, they argue, the City may obtain free service and payment in lieu of ad valorem taxes; the added payments to the City are based upon gross revenues of the systems and are not structured so as to have any relationship to a fair return upon investment. They conclude that any gain beyond free service and payment in lieu of taxes must be either a tax upon the consumer, from the payment of which they claim to be exempt, or a contribution, which may not be exacted from public entities under Art. 3, §§ 51 and 52 of the Texas Constitution.

■ Our construction of the two statutes is quite different—and quite simple. Prior to 1949 the owner of an encumbered municipal utility was restricted to the two specified items; no other benefits were permissible. After the enactment of Art. 1113a, this prohibition of Art. 1113 was removed in the case of cities of the designated population. Since the removal of the restriction, the City of San Antonio has enjoyed the usual right to make a reasonable profit from its gas and electric systems even while they are encumbered.

Petitioners make no complaint about the reasonableness of the rates or of City's return from its gas and electric systems. They do complain about the City being paid a percentage of the utilities' gross revenue. If the rate charges are reasonable, it does not matter how the Indenture sets the priority of payment of available revenue. The June 6, 1974 rate ordinance of the City recites that the "rates are sufficient to provide only a reasonable and proper return upon the fair value of the Electric and Gas Systems properties dedicated to the furnishing of electric and gas services." [1] Petitioners make no contention or showing to the contrary on that controlling proposition.

During the recent period of escalating fuel costs the record suggests the possibility

---

1. The City points out that Sec. 136 of the City Charter provides that the Supervisor of Public Utilities "shall assemble the facts which are essential to proper determination of cost of service and the fixing of reasonable rates. He shall have and keep up to date an inventory of

the property used in public service, the cost of such properties as actually and reasonably incurred or as fixed by appraisal, additions and retirements made each year, the depreciation and all matters that enter into the periodical readjustment of the rate base."

that the City's return may have exceeded the margin of reasonableness. It is stipulated that the full 14% of gross revenues was paid for several years, and the City received almost 23 per cent of its total budget requirement in 1974 from the gas and electric systems. Upon proper pleading and record, if the City's return were proved to be excessive and unreasonable, the courts could grant relief. See *State v. Southwestern Bell Tel. Co.*, 526 S.W.2d 526 (Tex.1975). Courts avoid interfering with rates fixed by an independent legislative authority. See *St. Paul Book & Stationery Co. v. St. Paul Gaslight Co.*, 130 Minn. 71, 153 N.W. 262 (1915); *Seaberg v. Raton Public Service Co.*, 36 N.M. 59, 8 P.2d 100 (1932). The courts should, however, pass upon the unreasonableness of the rates of a municipally owned utility (set by that municipality) in order to protect the utility customers from being unfairly burdened with the costs of city government. See *South Texas Public Service Co. v. Jahn*, 7 S.W.2d 942, 945 (Tex. Civ.App.1928, writ ref'd); *Mitchell v. City of Mobile*, 244 Ala. 442, 13 So.2d 664 (1943); 64 Am.Jur.2d Public Utilities § 128.

The question of the justiciable interest required for a party to seek judicial intervention against excessive City of San Antonio utility rates was addressed in *Schenker v. City of San Antonio*, 369 S.W.2d 626 (Tex.Civ.App.1963, writ ref'd n. r. e.). The dismissal of that action brought by customers of the City was upheld by the Court of Civil Appeals on two grounds: because the plaintiffs had not exhausted their administrative remedies through petition to the City Council and because the plaintiffs lacked justiciable interest to bring the suit. The Court there said that no special injury was alleged apart from the injury to the general public and that therefore "[o]nly lawfully constituted guardians of the public interest may maintain actions for the redress of such character of injuries." 369 S.W.2d 630. It should be noted that this Court in *City of Texarkana v. Wiggins*, 151 Tex. 100, 246 S.W.2d 622 (1952), in holding that a city may not discriminate in the rates charged nonresidents, said:

It is settled in this state that the petitioner, upon the purchase by it of the property of the privately-owned utility, was subject to this same rule prohibiting unreasonable or unjustified discrimination in rates and service. . . . The real reason for the rule that, in so far as treatment of consumers is concerned, the municipally-owned utility is no different from the privately-owned utility is that the economic nature of the business has not changed; it remains a monopoly in spite of the change in ownership. 246 S.W.2d 625.

Many other jurisdictions have permitted consumer suits attacking excessive charges or discrimination by municipal utilities. E. g., *State v. Grant Circuit Court*, 239 Ind. 315, 157 N.E.2d 188 (1959); *Holton Creamery Co. v. Brown*, 137 Kan. 418, 20 P.2d 503 (1933); *Twitchell v. City of Spokane*, 55 Wash. 86, 104 P. 150 (1909); *City of Mt. Vernon v. Banks*, 380 S.W.2d 268 (Ky.1964); *Erickson v. Metropolitan Utilities Dist.*, 171 Neb. 654, 107 N.W.2d 324 (1961); *Hicks v. City of Monroe Utility Comm.*, 237 La. 848, 112 So.2d 635 (1959); *Chicopee Mfg. Corp. v. Manchester Board of Water Com'rs*, 97 N.H. 109, 81 A.2d 837 (1951); *Kiefer v. City of Idaho Falls*, 49 Idaho 458, 289 P. 81 (1930); *Delony v. Rucker*, 227 Ark. 869, 302 S.W.2d 287 (1957); 12 McQuillin, Municipal Corporations (1970) § 35.37a; 64 Am.Jur.2d Public Utilities § 131.

## FUEL ADJUSTMENT PASS THROUGH CHARGES

■ In 1965 the City Council of San Antonio passed an ordinance setting rates for sale of gas and electricity which permitted the City's Public Service Board to adjust the rates according to a set formula without further action by the City to compensate for increased (or decreased) fuel costs. This device was continued in the June 6, 1974 ordinance which contained the following fuel adjustment clause:

Plus or minus 0.00125¢ per KWH for each whole 0.1¢ per million BTU by which the delivered cost of fuel to generate electricity is above or below 24.1¢ per million

BTU (as computed from Account No. 501 "Fuel" in the books of the CPS Electric System) during the calendar month preceding the current meter reading date. The delivered cost of fuel as stated above is defined as the estimated cost of fuel for the calendar month mentioned above plus the difference (actual less estimated) in the cost of fuel for the second calendar month preceding the current meter reading date. Also, plus or minus an adjustment to provide for any increase or decrease, due to the purchase of power or energy from others, above or below the base cost of generation in CPS plants included in these rates.

Plus or minus the proportionate part of the increase or decrease in taxes, required payments to governmental entities or for governmental or municipal purposes which may be hereafter assessed, imposed, or otherwise required and which are payable out of or are based upon revenues of the Electric System.

This measure was enacted at a time of rapid and enormous increases in the cost of fuel to the City. Automatic rate increases to the consumers resulted—which carried along an automatic charge for the benefit of the City under the second paragraph quoted above. The City Council reduced the latter portion of the fuel adjustment clause charge by passing an ordinance on December 19, 1974 which provided:

SECTION 1. The City Public Service Board is hereby directed to exclude all revenues from gas cost adjustment charges on natural gas delivered directly to customers on the gas distribution system from computation of the 14% payment due to the City General Fund under the Bond Indenture, as amended.

SECTION 2. Effective August 1, 1975, the City Public Service Board is hereby directed to exclude all revenues from fuel adjustment charges on electrical generation on the first 300 KWH per month delivered directly to customers from computation of the 14% payment due to the City of San Antonio under the CPSB Bond Indenture.

SECTION 3. Effective August 1, 1975, the CPSB is hereby directed to exclude all revenues from fuel adjustment charges for electrical generation on the fuel cost above $1.20 per million BTU delivered directly to the customers from computation of the 14% payment due to the City of San Antonio under the CPSB Bond Indenture.

Petitioners attack the fuel adjustment charges, which they have been required to pay, on the following grounds: "A utility which increases profits by a fuel adjustment clause is gouging its customers *ipso facto*"; and because this is an unlawful delegation of ratemaking discretion to the City Public Service Board. We disagree with both contentions. A charge by the City equal to 14% of the cost of the fuel may or may not "gouge" the customers; that depends upon the total revenues or gain by the City, and petitioners make no complaint at that point. Further, no discretion is thereby given the Public Service Board in the setting of rates.

If the total return to the utility is not at issue, it is immaterial whether the fuel adjustment clause allows the addition of a fixed return to the City along with the higher cost of fuel to the City. Because petitioners are not complaining of the reasonableness of the rates or of the return to the City, they are in no position to complain of the amount of some component of that rate or return. As for the contention that there is an improper delegation of ratemaking power to the City Public Service Board, nothing is left to the Board or its staff except the computation of charges pursuant to the rate ordinance and according to the cost of fuel. No discretion is left by which this computation may be changed. We agree with the following statement in the Opinion of the Attorney General of Texas No. H–741, dated November 20, 1975:

In our opinion a city's enactment of a rate ordinance which includes an automatic adjustment clause based on ascertainable costs controlled by the impersonal forces of the marketplace may be a lawful exercise of the municipality's rate

regulation power. Such an ordinance establishes a rate schedule which changes in response to fluctuations in operating costs. It sets current rates and provides an objective formula for computing future rates. See *City of Norfolk v. Virginia Electric & Power Co.,* [197 Va. 505,] 90 S.E.2d 140 (Va.1955); *City of Chicago v. Illinois Commerce Commission,* [13 Ill.2d 607,] 150 N.E.2d 776 (Ill.1952); Foy, Cost Adjustment in Utility Rate Schedules, 13 Vand.L.Rev. 663 (1960).

Automatic fuel adjustment charges are in common use and have been repeatedly upheld against attack on the ground of unlawful delegation of legislative authority over ratemaking. See generally, Fowler, Purchased Gas Adjustment Clauses: An Adjuster's Viewpoint, 6 St. Mary's L.J. 567 (1974).[2]

The judgment of the Court of Civil Appeals is affirmed.

---

**2.** Utilities regulated by the new Texas Public Utilities Commission may employ automatic fuel adjustments, but the utility must file with the Commission, before adjusting the cost to the customer, a copy of its contract for fuel with a revised schedule of anticipated adjustment. These changes are reviewed and may be disallowed by the Commission. Regulation 052.02.033, Vol. 1, Texas Register, pg. 1691 (June 25, 1976).