**CITY OF SAN ANTONIO, Appellant,**

v.

**SAN ANTONIO INDEPENDENT SCHOOL DISTRICT, Appellee.**

No. 04–83–00192–CV.

Court of Appeals of Texas, San Antonio.

Nov. 30, 1984.

Rehearing Denied Jan. 4, 1985.

Crawford B. Reeder, Asst. City Atty., San Antonio, for appellant.

Anthony Nicholas, Joseph E. Scuro, Nicholas & Barrera, San Antonio, for appellee.

Before CADENA, C.J., and CANTU and DIAL, JJ.

## OPINION

DIAL, Justice.

This is an appeal from summary judgment in favor of the San Antonio Independent School District (SAISD) exempting it from paying certain charges for gas and electric service from the utility owned by the City of San Antonio.

The City purchased the utility in 1942 pursuant to the authority of TEX.REV. CIV.STAT.ANN. art. 1111–1118 (Vernon 1963). To finance the purchase, the City entered into a trust indenture. The indenture and the applicable statutes provided that the utility would be managed by a self-perpetuating board of trustees not appointed by the City. The indenture also created a lien on the properties and revenues of the system. The indenture and the statutes provided for payment to the city from the utility in three components pertinent to the instant suit:

(1) A payment in lieu of ad valorem taxes.

(2) Reimbursement for the City's payments for gas and electricity and expenditures for street lighting extensions and improvements.

(3) An additional payment in an amount that when added to (1) and (2) above would total 14% of the utility's gross revenues.

Starting in 1975, SAISD, twelve other independent school districts in Bexar County, and the Bexar County Hospital District, either escrowed or withheld 14% of their monthly bill from the City's utility. The City sued for declaratory and monetary relief. The facts were undisputed and stipulated. All parties filed motions for summary judgment except SAISD. The City's motion for summary judgment was granted, and all others were denied.

The school and hospital districts appealed, and the Eastland Court of Appeals reversed the trial court. *San Antonio Independent School District, et al v. City of San Antonio*, 614 S.W.2d 917 (Tex.Civ. App.—Eastland 1981, writ ref'd n.r.e.). The appellate court held that TEX.REV. CIV.STAT.ANN. art. 1446c, § 48 (Vernon 1980) [1] applied to the City. This resulted in exempting the school and hospital districts from paying rates which "may be used to make or to cover the cost of making payments in lieu of taxes to the municipality by which the public utility is owned." The court rendered judgment for all appellants except SAISD. Since SAISD had not filed a motion for summary judgment, judgment against it was reversed, and the cause re-

---

1. Article 1446c, § 48.

No payments made in lieu of taxes by a public utility to the municipality by which it is owned may be considered an expense of operation for the purpose of determining, fixing, or regulating the rates to be charged for the provision of utility service to a school district or hospital district. No rates received by a public utility from a school district or hospital district may be used to make or to cover the cost of making payments in lieu of taxes to the municipality by which the public utility is owned.

manded. Application for writ of error was refused, n.r.e. On remand, the trial court granted summary judgment for SAISD declaring,

Section 48 of article 1446c exempts (SAISD) from paying gas and electric utility charges to (City) which are based upon rates which are set so as to allow the following as items of expense of the system's operation:

(a) lieu of tax payments by the utility to the City;

(b) reimbursement by the utility to the City for the latter's gas and electrical expenses and expense of additions to the City's street lighting and traffic lighting systems, and

(c) profit made by the City from the utility's operation, as that term is defined in *San Antonio Independent School District v. City of San Antonio,* 550 S.W.2d 262 (Tex.1977); although under the terms of the Trust Indenture *only part* of the payments made by the System to the City is in lieu of taxes, as set forth in Section 48. This Summary Judgment is granted solely because of the holding by the Eastland Court of Appeals.

The City now brings this appeal contending that the trial court erred in granting the summary judgment in favor of the SAISD since the Eastland decision had not actually addressed the issue as to what constitutes payments "in lieu of taxes" under article 1446c, § 48. The City argues that § 48's exemption pertains only to payments made in lieu of ad valorem taxes, thus, narrowly construing the language of § 48 and preserving the school district's liability for those charges attributable to expenses other than the reimbursements for lost taxes.

The City concedes that the Eastland decision did resolve that § 48 was applicable to San Antonio's gas and electric utility, and with regard to that issue, the doctrine of the law of the case applies. The City, however, urges that the trial judge's decision to apply § 48's exemption to all three component payments as "in lieu of taxes"

based solely on the Eastland decision was error since such an interpretation went beyond the scope of the Eastland holding.

The issue as to what constitutes § 48's "payments in lieu of taxes" had been presented to the Eastland Court in a cross-point, however, it was not specifically addressed in that Court's decision. Likewise, the City's motion for rehearing to that Court of Appeals and subsequent writ of error and motion for rehearing to the Supreme Court re-asserted the issue but were denied without opinion.

The doctrine of "the law of the case" is that principle where, the determination of a question of law having already been made on a prior appeal to a court of last resort, such determination will generally be held to govern the case throughout all of its subsequent stages, including a retrial and subsequent appeal. *Transport Insurance Co. v. Employers Casualty Co.,* 470 S.W.2d 757, 762 (Tex.Civ.App.—Dallas 1971, writ ref'd n.r.e.); *Houston Endowment, Inc. v. City of Houston,* 468 S.W.2d 540, 543 (Tex.Civ.App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.). Questions of law expressly decided in a prior appeal are subject to the doctrine.

Since the court neither expressly or by necessary implication determined the meaning of § 48's "payments in lieu of taxes," we hold that the Eastland decision is inapplicable to that issue now before this court.

We sustain City's first point of error.

The City's second point of error is that the trial court erred in failing to limit § 48's application solely to the "in lieu of taxes" component of the utility's payments to the City. In its counterpoint, SAISD argues that all of the component payments made pursuant to the indenture are "in lieu of taxes" because if the City did not receive those payments, it would have to raise the money it derives from them by taxation. The City rebuts this contention by presenting numerous sources of City revenues, the payments from which are not considered taxes. Indeed, such was the

holding in *Bexar County v. City of San Antonio*, 352 S.W.2d 905 (Tex.Civ.App.— San Antonio 1962, writ dism'd), where this Court expressly held that sewer charge revenues which render a profit to the City were not taxes. *Id.* at 908. The mere fact that revenues are put into a general fund and used for public purposes, as were the payments in the case at hand, does not necessarily make them taxes.

The City's position is further supported by strong caselaw. In *San Antonio Independent School District v. City of San Antonio*, 550 S.W.2d 262 (Tex.1977), the Supreme Court specifically addressed the issue as to what constitutes payments "in lieu of taxes." In that case, which involved the same trust indenture as the case at bar, all the school districts in San Antonio sought a declaratory judgment against the City for the refund of portions of gas and electric payments they had paid in previous years. Their argument was similar to that presented in the present case. The schools contended that since the 14% indenture payment authorized by article 1113a was factored into the municipally-owned utility's rates, their payments as a part of that 14% was a tax on them prohibited by the Constitution. The Supreme Court denied the school districts' claims of exemptions and clarified the nature of the indenture payments. The court recognized that the first component is a payment in lieu of ad valorem taxes that would be received if the utility was not municipally owned, which the City is entitled to receive under TEX. REV.CIV.STAT.ANN. art. 1113. Component payment number (2) is free service which the City is entitled to receive under the same statute. The cash payment in number (3), was held to be a reasonable profit which the City is entitled to receive under TEX.REV.CIV.STAT.ANN. art. 1113a, which was enacted in 1949. *Id.* at 263–64. Thus, the whole 14% is not a payment in lieu of taxes.

■ Accordingly, we reverse the trial court's judgment and render as to the meaning of the phrase "payments in lieu of taxes" found in article 1446c, § 48. Our interpretation of that phrase is that it includes only payments made by the utility to the City to offset the City's lost ad valorem tax revenues.

The City may retain all funds received by it or the utility from SAISD under the Interim Payment Agreement heretofore entered into by the parties except the fractional equivalent of the monies paid by the utility to the City in lieu of ad valorem taxes for the period in question.

CADENA, Chief Justice, concurring.

We are not, in this case, required to give controlling effect to the prior decision of the Eastland Court as the law of the case if such decision is clearly erroneous. *See Barrows v. Ezer*, 624 S.W.2d 613 (Tex.Civ. App.—Houston [14th Dist.] 1981, no writ), *Connecticut General Life Insurance Co. v. Bryson*, 148 Tex. 86, 219 S.W.2d 799 (1949).

Article 1446c, section 48 provides only that "payments in lieu of taxes" shall not be considered "an expense of operation" of a city owned utility in determining the rates to be charged for the provision of service to a school district or hospital district. If the Eastland Court held that "payments in Lieu of taxes" as that term is used in section 48, to include any payments other than those payments representing the amount of taxes paid by the previous private owners of the system, such holding is clearly erroneous and lacks support in the law and in the facts of this case.

Before discussing the egregious nature of the error, it should be pointed out that we are dealing with a decision of another intermediate appellate court, and not with a decision of the Texas Supreme Court.[1]

---

**1.** The Supreme Court's refusal of a writ of error does not make the judgment of the intermediate court the judgment of the Supreme Court. When an application for writ of error is refused, the judgment of the intermediate appellate court remains the operative judgment in the case. *Merchandise Mart, Inc. v. Marcus*, 515 S.W.2d 663 (Tex.1974).

The opinion of the Eastland Court of Appeals on which the school district relies reflects only

Prior to 1949 article 1113 prescribed the only financial benefits enjoyable by a city which owned its own utility system as the result of such ownership. The statute provided for free service to the city. This provision for free service was followed by a provision requiring that the rates charged for service be sufficient to pay (1) operation, maintenance, depreciation, replacement, betterment and interest charges; (2) interest and principal on outstanding bonds; and (3) outstanding indebtedness of the system. The statute then proscribed the use of revenue from the system for any other debt, expense or obligation of the city, except payments in lieu of ad valorem taxes paid by the private owners of the system. In brief, the statute provided, in three separate sentences for:

1. Free service to the city.

2. Payment of principal and interest on outstanding bonds.

3. Payment of certain debts enumerated in the statute.

4. Payments in lieu of ad valorem taxes.

Even the most casual reading of the statute compels the conclusion that the provision for free services is separate and distinct from the provision for payments in lieu of ad valorem taxes. The statute authorized free service and payments in lieu of taxes.

Article 1113a, enacted in 1949, authorizes the transfer to the city from the revenues of the utility system in any amount authorized by the indenture securing the payment of revenue bonds. The emergency section of the 1949 enactment recites that the increased costs of labor and material required for the rendition of municipal services "requires that all sources of municipal revenues be immediately availed of by" cities which own utility systems.[2]

It is manifest that article 1113a was enacted for the purpose of permitting cities which owned utility systems to provide, by indenture, for payment to the general funds of such cities from the revenues of the utility, in addition to payments in lieu of taxes already authorized by article 1113. It must be concluded that not all payments made to a city from revenues of utilities owned by such city constitute "payments in lieu of ad valorem taxes." If the provision for payments in lieu of ad valorem taxes which is found in article 1113 includes payments of the amount of ad valorem taxes which would be paid if the utility were privately owned as well as all other payments which might be made to the city from the utility's revenues, then the Legislature, in enacting article 1113a in 1949, was doing a useless thing.

The indenture between the City of San Antonio and the holders of gas and electric revenue bonds contains a "flow of funds" provision which assigns priorities to the purposes for which the utility's revenues may be applied. The revenues are to be used according to the following priority:

1. Payment of operating expenses.

2. Payment of principal and interest on outstanding bonds.

one holding by the Eastland Court. The only question discussed in the opinion is whether the term "public utility" found in article 1446c, § 48, applies to a municipally-owned utility. The only holding reflected in the opinion is that § 48 applies to a municipally-owned utility. The only meaning of a term discussed in the opinion is the meaning of the term "utility." Nowhere in the opinion did the Eastland Court make any statement which indicates that it was concerned with the meaning of the term "payments made in lieu of taxes." *San Antonio Independent School District v. City of San Antonio,* 614 S.W.2d 917 (Tex.Civ.App.—Eastland 1981, writ ref'd n.r.e.).

It has been held that the only issues settled by the Supreme Court's refusal of an application for writ of error are those "which are found in the opinions [sic] of the" intermediate court. *Sierra Club v. Austin Independent School District,* 489 S.W.2d 325, 330 (Tex.Civ.App.—Austin 1973), *rev'd, other grounds,* 495 S.W.2d 878 (Tex. 1973).

2. Acts 1949, 51st Leg., p. 940, ch. 513, § 2. As enacted in 1949, article 1113a applied only to cities having a population of 200,000 or more. It was amended in 1953 to make the provisions applicable to cities having a population of 10,000 or more. Acts 1953, 53rd Leg., p. 422, ch. 122, § 1.

3. Reimbursement to the city for loss of taxes which the city would have received if the utility were privately owned.

4. Payment of an amount equal to 12½% of gross revenues into an Improvements and Contingencies Fund.

5. After the payment of 12½% of gross revenues to the Improvement and Contingency Fund, the following payments are to be made to the city's fund, to the extent available from the remaining revenues:

a. A sum sufficient to reimburse the city for all amounts paid to the utility by the city during the year for gas and electric services used by the city for municipal purposes.

b. A sum in cash which when added to (1) the payment in lieu of taxes (2) the amount of reimbursements for electric and gas services during the year, and (3) the amount expended during the year for additions to the street and traffic lighting systems, will total an amount equal to 14% of the gross revenues of the system.

It is significant that the "flow of funds" provisions of the indenture establish five priorities. The provision for payment in lieu of taxes has a number 3 priority, with only the provision for payment of operating expenses and payment of principal and interest on bonds having a higher priority. The provisions for free service (reimbursement for amounts paid for service and additions to the street and traffic lighting systems) and for the payment of additional sums in cash which, when added to the payment in lieu of taxes and the costs of free service, will total 14% of the gross revenues of the city are assigned the lowest priority, number 5. The payments into the general fund under priority number 5 are expressly conditioned to be made until the payment required by priority number 4 (payment into Improvement and Contingencies Fund) has been made. Thus, the payment in lieu of taxes has a higher priority than the payment into the Improvement and Contingencies Fund, while the other payments into the general fund have a lower priority. The indenture, like article 1113, makes a clear distinction between payments in lieu of taxes and other payments into the city's general fund.

The phrase "payment in lieu of ad valorem taxes paid by private owners" is free from ambiguity. It refers to payment for taxes, based on the value of the thing taxes, imposed by a governmental agency in the exercise of the taxing power. While it is conceivable that a privately owned utility, in addition to paying ad valorem taxes imposed by the city, might agree to, in effect, make an additional payment of 14% of the utility's gross revenues to the city, such additional payment would not be a payment of ad valorem taxes. A payment in addition to taxes is not a payment in lieu of taxes. The payment in addition to taxes would necessarily result from the civic mindedness and generosity of the private owner, or from a contract, but it would not arise from the exercise by the city of its power to levy ad valorem taxes. In the case before us, the city receives the additional payments because of the provisions in the indenture, authorized by article 1113a, and not as revenues derived from the exercise of the taxing power. If the indenture did not provide for such additional payments, the city could not, by exercising its taxing power, require that the payments be made.

In *San Antonio Independent School District v. City of San Antonio*, 550 S.W.2d 262, 264 (Tex.1977), our Supreme Court held that the benefits received by the City of San Antonio, in addition to payments in lieu of taxes and free services, represented, under articles 1113 and 1113a constitute a profit realized by the city as a result of its ownership of the gas and electric systems. The decision of the Eastland Court cannot be reconciled with this holding, unless we are prepared to accept the indefensible theory that making a profit constitutes a payment in lieu of ad valorem taxes. The benefit results, as the Supreme Court pointed out, from the fact that the city owns the utility. If the utility were privately owned, the city could not exact such payment by exercising its taxing power.

The school district argues that the payments in dispute must be classified as payments in lieu of taxes because, in the absence of such payments, the city would have to impose taxes in order to raise an equivalent amount of revenue. This argument is completely unpersuasive. The notion, if accepted, would compel the conclusion that all revenue received by a city, including such things as fines levied by municipal courts and revenues realized from the sale of surplus city property, represents a payment in lieu of taxes.

Article 1113 makes a clear distinction between the receipt of free services and payments in lieu of taxes. The indenture entered into by the City of San Antonio and holders of gas and electric bonds issued by the city clearly recognize the distinction. Since, as the Supreme Court has held, the city is entitled to make a profit from its ownership of the gas and electric systems, payment of such a profit to the city from the revenues of the utility system cannot be classified as a payment in lieu of taxes, since the city would not receive such revenues as taxes if the system was privately owned.

It is true that section 48 of article 1446c uses the term "payments in lieu of taxes" rather than "payments in lieu of ad valorem taxes," the phrase used in article 1113. Rendition of free services and the payment of a profit to the owner of a utility cannot be classified as payments in lieu of taxes, ad valorem or otherwise. A city could not compel, by exercise of the taxing power, a privately owned utility to render free service to the city. A city could not, by exercise of its taxing power, compel such private owner to forego a right to make a profit and, instead, pay such profit to a non-owner. Since a city lacks the power to exact such benefits from a private owner as part of his obligation to pay taxes, its receipt of such benefits from a utility

owned by it cannot be classified as payments in lieu of taxes. Need we ask the question: In lieu of which taxes are such benefits received?

There is nothing in the language of section 48 of article 1446c which suggests that "payments in lieu of taxes" was intended to include all benefits received by a city because of its ownership of a utility system. "Payments in lieu of taxes" must be taken to refer to those taxes which the city would receive if the utility system were privately owned. To interpret the phrase as referring to all benefits received by a city because of its ownership of a utility would be to impute to the legislature a complete unfamiliarity with the English language. It can be conceded that "taxes" is a broad term, but under no conceivable theory can it be expanded to include benefits and revenues which the city would be powerless to exact from a utility which is privately owned.

If the Eastland Court held that "payments in lieu of taxes" includes free services and the realization of a profit from the owner of a utility, the decision is "clearly erroneous" and should not be applied to this case as "the law of the case."

CANTU, Justice, dissenting.

Today a majority[1] of this court bows to the dogged reluctance of the appellant City's refusal to accept appellate finality and we are treated to the application of a new twist to the doctrine of the law of the case. That doctrine as applied today transforms the prior result into the law of *that* case and the result in this appeal, the majority pronounces, becomes the law of *this* case.

I think judicial honesty would be best served if both simply disagreed and registered their disagreement with the holding of the Eastland Court of Appeals instead of

1. Since the registering of my dissent to the original majority opinion written by Justice Dial, Chief Justice Cadena, now candidly and in a "no holds barred" approach lambastes the holding of the Eastland Court of Appeals in his concurring opinion. Although Justice Dial's opinion can no longer accurately be referred to as a majority opinion, collectively both opinions do a disservice to the doctrine of the law of the case. Insofar as both opinions refuse to adhere to the doctrine, I will continue to refer to them collectively as "the majority."

fantasizing that our brethren in Eastland were incapable of recognizing issues being presented, not once but twice. The import of both opinions is that the decision of the Eastland Court was based upon an erroneous or incomplete application of the law necessary to a plenary disposition of the matter before it. If the majority believes the prior opinion to be erroneous [2] it should exhibit the honesty and candor one can at least attribute to the City's posture in the instant appeal.[3]

Justice Dial, after alluding to the doctrine, makes the following statement: "Since the court neither expressly or by necessary implication determined the meaning of § 48's 'payments in lieu of taxes,' we hold that the Eastland decision is inapplicable to that issue now before this court." [4]

Such a statement can only mean that the Eastland Court was not authorized to arrive at a final decision on the merits without addressing every contention raised by the parties. This court, as does every appellate court, often disposes of points deemed unnecessary to a final determination by simply not addressing them. A disposition sub silentio does not mean that the court has not given the contentions raised due consideration. To the contrary, addressing unnecessary contentions rarely adds to the jurisprudence of this state regardless of the parties' desire for an advisory opinion.

To conclude that the Eastland Court, and the Texas Supreme Court as well, did not expressly or by necessary implication address the contention now once again urged is hogwash. The Supreme Court's action on the application for writ of error and subsequent motion for rehearing can hardly be classified as a failure to consider the contentions urged simply because the court refused to write on the matter. In my opinion the contentions reurged were just as conclusively overruled by both courts' refusal to address them. *See Goodman v. Olsen,* 365 So.2d 393, 396 (Fla.App.1979) [... when a point which was not discussed in an appellate opinion is necessarily determined by the opinion, the doctrine of law of the case is applicable].

2. Chief Justice Cadena's belated attempt to claim error in the Eastland holding, however, falls short of the prerequisite to invoking the exception to the doctrine. The exception applies only where the decision on a former appeal was *clearly* erroneous. *Connecticut General Life Insurance Co. v. Bryson,* 148 Tex. 86, 219 S.W.2d 799 (1949); *Miller v. Winn,* 28 S.W.2d 578 (Tex.Civ.App.—Fort Worth 1930, writ ref'd). I refuse to ascribe to the observation made by Chief Justice Cadena that the Supreme Court by refusing to grant writ of error with the notation "no reversible error" was incapable of recognizing error of such "egregious nature." If the error was so egregious it would have been readily identifiable without the need for further reflection. I further question the authority of the majority to decline to adhere to the doctrine when only one justice ascribes to the "erroneous holding" exception.

3. The City of San Antonio in its Supplemental Motion for Summary Judgment and throughout the appellate history of this case has openly displayed its intentions, viz:

Although the facts in this case are undisputed and are the same for purposes of the court's decision as when the Eastland decision was rendered the City still asserts the same legal contentions, arguments, and authorities as it has always asserted. This is not because of mere stubborness, but because of two factors about the Eastland decision: (1) The decision was wrong. It did not address the issues raised by the parties' briefs; it cited law not cited by either party and not relevant to the proper determination of the case; and it recited as 'undisputed facts' matters not true and not even in the record. (2) It also failed to decide the City's alternative point, raised by crosspoint in City appellee's brief upon which point a decision was necessitated by the decision on the portion of the case which the court determined adversely to the City. Although the omission was called to the Eastland Court's attention on Motion for Rehearing, that court summarily (in one week) denied such motion without comment....

\* \* \* \* \* \*

In short, City wishes a relitigation of its principal contentions for the reasons contained above and City especially wants an express judicial determination of its alternative point.... This point has never been expressly determined one way or the other by *any* court.

4. Even the City admits that the Eastland opinion impliedly decided the point it now urges on appeal but urges that such decision by implication should not be binding as law of the case inasmuch as the basis for the decision cannot be ascertained from a reading of the opinion.

The doctrine has often been addressed by Texas courts and defined as that principle which states that questions of law decided on appeal to a court of ultimate last resort will govern the case throughout all of its subsequent stages, including a retrial and a subsequent appeal. *Barrows v. Ezer,* 624 S.W.2d 613 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ); *Kropp v. Prather,* 526 S.W.2d 283 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r.e.); *Houston Endowment, Inc. v. City of Houston,* 468 S.W.2d 540 (Tex.Civ.App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.). The doctrine has also been stated to mean that the holdings announced in a former appeal constitute the law of the case; that matters were either presented to or directly passed upon or which were in effect disposed of on a former appeal to a court of civil appeals will not again be passed upon by that court. *Allied Finance Co. v. M.T. Shaw,* 373 S.W.2d 100 (Tex.Civ.App.—Fort Worth 1963, writ ref'd n.r.e.).

In *Roberts v. Armstrong,* 231 S.W. 371 (Tex.Comm'n App.1921, holding approved, judgment adopted), the court in quoting from *Wells on Res Adjudicata and Stare Decisis,* § 6B, stated:

It is a well-settled principle that the question of law decided on appeal to a court of ultimate resort must govern the case in the same court and the trial court, through all subsequent stages of the proceedings, and will seldom be reconsidered or reversed, even if they appear to be erroneous.

The application of this rule, however, contemplates that the facts on the second appeal shall be substantially the same, or rather, perhaps, that they shall not be such as to affect materially the legal questions involved under the first appeal.

It is undisputed that the facts on the second appeal [the instant one] are identical to those in the first appeal. It is further undisputed that the legal questions involved are the very same ones presented in the first appeal. Nor is there any serious contention, other than by the City in its bid to have the same matter once again litigated, that the decision of the Eastland Court is clearly erroneous.[5] Even the majority is unwilling to agree that clear error exists in the Eastland opinion in view of the notation of no reversible error granted by the Supreme Court.

This very court in *Exxon Corp. v. Butler,* 585 S.W.2d 881 (Tex.Civ.App.—San Antonio 1979, writ dism'd, 619 S.W.2d 399), speaking through Justice Murray, recognized that the doctrine applies irrespective of whether the decision of the former appeal is right or wrong. *See also, Chicago & N.W. Transportation Co. v. United States,* 574 F.2d 926 (7th Cir.1978). Thus, even if the majority disagrees with the prior holding and desire to express the opinion that the Eastland Court fell into error, the doctrine mandates that this court refuse to reconsider what has already been decided. This is so not because of a limitation on the power of this court, but because of public policy's concern with a finality to litigation. *Elliott v. Moffett,* 165 S.W.2d 911 (Tex.Civ.App.—Texarkana 1942, writ ref'd w.o.m.). Because the Eastland Court is a court of coordinate jurisdiction, comity considerations require this court to refuse to rehear that which has once before been advocated and rejected. *People v. Watson,* 57 A.D.2d 143, 393 N.Y.S.2d 735, 738 (1977). The doctrine of the law of the case is designed to prevent just such an anomaly as would result from this court telling the trial court that it had erred in obeying the mandate of the Eastland Court. *See Chicago & N.W. Transportation Co. v. United States, supra,* at 930.

The United States Court of Appeals for the Seventh Circuit in *Chicago* recognized the long term effects of the problem which the majority now creates. It stated:

The fact that earlier review was by a different court does not alter our conclusion. If anything, that fact makes the case for application of the doctrine even stronger, for principles of comity come into play. If we now held that the com-

---

**5.** The City categorizes the Eastland opinion as "bizarre and arcane."

mission erred in obeying the mandate of the three-judge court, a third court reviewing the commission's order following our remand might hold that we in turn were wrong. That result would be prevented only by the same doctrine of law of the case, aided by principles of comity. *See Gulf Research & Development Co. v. Schlumberger Well Surveying Corp.,* 98 F.Supp. 198, 200–201 (D.Del.), *petition for mandamus denied sub nom; Gulf Research & Development Co. v. Leaky,* 193 F.2d 302 (3rd Cir.1951), *aff'd per curiam by an equally divided court,* 344 U.S. 861, 73 S.Ct. 102, 97 L.Ed. 668 (1952); *see generally, Hoffman v. Blaski,* 363 U.S. 335, 345, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1969) (Frankfurter, J., dissenting), that should govern us now.

574 F.2d at 930.

The law of the case must control the disposition of this case in the absence of some unusual circumstance or some compelling reason. *See Chicago & N.W. Transportation Co. v. United States, supra.* None appears of record and the majority can point to none other than to intimate that the Eastland Court did not finish the job or that upon subsequent reflection egregious error cries out from the prior holding.

While this court may reserve to itself the right to disagree with the decision of the Eastland Court as it may be applied to another case, yet it is well settled that a judgment of an appellate court in a case becomes the law of that particular case, and is not subject to review on a second appeal. *Cf., Rail N Ranch Corp. v. State,* 441 P.2d 786, 7 Ariz.App. 558 (1968).

I find the following language in *Rail N Ranch Corp. v. State, supra,* appropriate:

As we view the doctrine of law of the case, a policy objective is to provide for the orderly processing and expeditious resolution of controversy in a particular law suit. This policy would be frustrated if it were to be insisted that only the opposing parties in a particular appeal were to be bound as between themselves by an appellate decision rendered in a case. Multiple appeals in a single suit are not uncommon, and if decisions rendered on appeal were to be binding only as between the opposing parties on appeal, instead of orderly procedure, we would have a procedural maze with many cul-de-sacs.

\*   \*   \*   \*   \*   \*

And, were we to attempt to completely undo what we did [or a court of coordinate jurisdiction did for us] [6] in the previous proceeding, we would be violating the fundamental principle of res judicata which we are seeking to satisfy, in that we would be holding against the position of parties to the previous appellate proceeding who have not been heard from in this appeal. And in any event, such judicial wheel-spinning would appear to be the very thing this doctrine is designed to avoid.

441 P.2d at 790.

I would affirm the judgment of the trial court insofar as it acts in obedience to the mandate of the Eastland Court and decline to give the City an advisory opinion on matters not properly before this court.[7] I respectfully register my dissent.

---

**6.** The first appeal was taken to this court but was subsequently transferred to the Eastland Court in November 1980 by virtue of a Supreme Court docket equalization order. The Eastland Court thus delivered an opinion we were originally obligated to deliver.

**7.** The City persists in its brief on appeal: "In order for the court to understand why the City is still litigating the case instead of merely bowing to the Eastland decision it is felt that the issues in the first trial and appeal should be outlined because they are not revealed by the Eastland opinion...."