**Affirmed in Part; Reversed in Part; Remanded; and Opinion filed April 23, 2019.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-00071-CV

---

**DATA FOUNDRY, INC., Appellant**

**V.**

**CITY OF AUSTIN, TEXAS, Appellee**

---

**On Appeal from the 419th District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-GN-17-000937**

---

### O P I N I O N

The City of Austin's municipally owned utility provides retail electricity to two Austin data centers owned by appellant Data Foundry, Inc. Data Foundry sued the City over its pricing of electricity, and the trial court dismissed the suit on the ground that Data Foundry lacked standing. We conclude that Data Foundry has standing to complain that the City's retail electricity rates are excessive in that the City's alleged 12% rate of return and its 2.36 debt-service coverage ratio are claimed

to be unreasonably high, and the trial court has jurisdiction to determine whether the resulting rates are unreasonable. However, the district court lacks jurisdiction over the remainder of Data Foundry's claims, as discussed below. We accordingly reverse the trial court's dismissal in part and remand the case for further proceedings consistent with this opinion.

## I. BACKGROUND

Until 2002, investor-owned utilities ("IOUs") were permitted to operate monopolies, selling the power they generated directly to municipal retail customers at rates set by the municipality. Effective January 1, 2002, however, the state legislature determined that, with certain exceptions discussed further *infra*, "electric services and their prices should be determined by customer choices and the normal forces of competition." TEX. UTIL. CODE ANN. § 39.001(a). IOUs were required to "structurally unbundle" by separating their business activities—including personnel, information flow, functions, and operations—into (a) a power-generation company, (b) a retail electric provider, and (c) a transmission and distribution utility. *Id.* § 39.051(b), (d). Power-generation companies set the rates at which they sell power to their wholesale customers (such as retail electric providers), and retail electric providers set the rates at which they sell power to retail customers (such as residences and businesses). Wholesale transmission services continue to be regulated by the Public Utility Commission ("the Commission").

Most of the state falls within an area known as the Electric Reliability Council of Texas, or ERCOT, that is, "the area in Texas . . . that is not synchronously interconnected with electric utilities outside the state" and in which ERCOT acts as the system operator. *See id.* § 31.002(5). All power-generation companies within this area—including the City's municipally owned utility—are required to sell wholesale energy only through ERCOT's wholesale "nodal" market, and all retail

2

electric providers are required to purchase from that same wholesale market all of the energy they use in providing retail service.

Municipally owned utilities ("MOUs") differ from IOUs in at least two important respects. Unlike IOUs, MOUs retain the right to operate as monopolies in providing retail electric service to customers within the municipality. And, unlike IOUS, MOUs are not required to "unbundle," structurally or functionally. An MOU has discretion to choose if and when it will offer customer choice, *id.* § 40.051(a), but that decision lies within its exclusive jurisdiction. *Id.* § 40.055(a)(2). Only the MOU can determine "whether to unbundle any energy-related activities," and if so, whether to unbundle structurally or functionally. *Id.* The City of Austin has not chosen to offer customer choice; it remains an integrated utility, selling both wholesale and retail energy service using the same employees and books.

The City provides retail electricity to two Austin data centers owned by appellant Data Foundry. Data Foundry's data center on Smith School Road is in the City's "Primary Service 2" (PS2) commercial rate class, which serves high-consumption customers who take electricity at high-voltage or "primary" levels and use between 3 and 20 megawatts of electricity. Data Foundry's data center on East Ben White Boulevard is in a different rate class; it takes electricity at low-voltage or "secondary" levels and uses more than 300 kilowatts of electricity.

Data Foundry sued the City, alleging that the City's retail rates are illegal, unenforceable, excessive, and discriminatory. Data Foundry's primary complaint is that the City includes in the rates it charges retail customers some of the costs of generating the electricity the City sells on the wholesale market. Data Foundry seeks declaratory and injunctive relief to end this practice. In addition, Data Foundry contends that the rates it must pay on its two accounts are excessive or discriminatory for a variety of reasons.

3

The City moved to dismiss the suit pursuant to Texas Rule of Civil Procedure 91a on the ground, among others, that Data Foundry lacks standing. Data Foundry now appeals the trial court's order granting the motion on that basis.

## II. STANDARD OF REVIEW

Standing is a component of subject-matter jurisdiction,[1] and Rule 91a[2] may be used, as it was here, to challenge the trial court's subject-matter jurisdiction. *See City of Dallas v. Sanchez*, 494 S.W.3d 722, 724–25 (Tex. 2016) (per curiam). We review *de novo* the trial court's ruling on the motion, construing Data Foundry's pleadings liberally and accepting as true Data Foundry's factual allegations and the inferences reasonably drawn from them to determine if Data Foundry alleged facts affirmatively demonstrating the trial court's subject-matter jurisdiction. *See id.* at 725.

Texas's standing requirements are derived from the state constitution's separation-of-powers provision,[3] "which denies the judiciary authority to decide issues in the abstract," and from its open-courts provision, "which provides court access only to a 'person for an injury done him.'" *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484 (Tex. 2018) (quoting TEX. CONST. art. I, § 13).[4] The standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court. *Id.* Under Texas law, the standing inquiry

---

[1] *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993).

[2] Rule 91a affords an expedited means of dismissing a cause of action on the grounds that it has no basis in law or fact. *See* TEX. R. CIV. P. 91a.

[3] *See* TEX. CONST. art. II, § 1 ("The powers of the Government of the State of Texas shall be divided into [the Legislative, the Executive, and the Judicial departments] . . . and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.").

[4] "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." TEX. CONST. art. I, § 13.

4

begins by determining whether the plaintiff has *personally* been injured, that is, the plaintiff must plead facts demonstrating that the plaintiff, rather than a third party or the public at large, suffered the injury. *Id.* at 485. The second element requires that the plaintiff's alleged injury be "fairly traceable" to the defendant's conduct because courts can act to redress only those injuries that can be fairly traced to the challenged conduct of the defendant, and not injury resulting from the independent action of some third party not before the court. *Id.* This required showing of a causal connection between the plaintiff's injury and the defendant's conduct serves as a means of identifying the proper defendant. *Id.* To establish the third standing requirement—often referred to as "redressability"—a plaintiff must show there is a substantial likelihood that the requested relief will remedy the alleged injury. *Id.* If the trial court lacks jurisdiction to render the requested relief, then a judgment purporting to do so will not remedy the injury because such a judgment is void and of no effect. *See Mapco, Inc. v. Forrest*, 795 S.W.2d 700, 703 (Tex. 1990) (orig. proceeding) (per curiam).

"[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 14 (Tex. 2011) (quoting *Davis v. FEC*, 554 U.S. 724, 734, 128 S. Ct. 2759, 171 L. Ed. 2d 737 (2008)). Data Foundry's claims and requests for relief are based on its allegations that the rates it is required to pay are either excessive or discriminatory. *See State v. Sw. Bell Tel. Co.*, 526 S.W.2d 526, 529–30 (Tex. 1975) (explaining that a utility enjoying a monopoly is legally obligated to offer its services at reasonable rates and without undue discrimination). We treat each of these broad categories separately.

5

### III. ALLEGEDLY EXCESSIVE RATES

Among Data Foundry's excessive-rate claims are its allegations that the City charges retail rates that are unreasonable and confiscatory. Data Foundry claims the City seeks an excessive rate of return[5] and that the rates constitute an illegal tax.

**A.     Claims to Exclude Wholesale Power-Generation Costs and a Return on Wholesale Power-Generation Assets from the Calculation of Retail Rates**

In what it describes as "the heart of this lawsuit," Data Foundry contends that the City unlawfully includes recovery of wholesale power-generation costs and a return on power-generation assets in its calculation of retail electricity rates. Because the City is required to sell the power it generates only on the wholesale ERCOT nodal market and similarly is required to buy all of the power it provides to its retail customers from the same ERCOT market, the City cannot bypass ERCOT and sell the power it generates directly to its retail customers. According to Data Foundry, the City's power-generation services are unprofitable, and because the revenue from the City's wholesale power-generation sales is insufficient to cover the costs of generating the power, the City includes recovery of those costs in its retail rates. Data Foundry contends that charging retail customers for the City's wholesale services is illegal, unjust, excessive, constitutes a taking, is confiscatory, and does not reflect a reasonable measure of use by, or benefit to, retail ratepayers. Data Foundry pleaded for declaratory and injunctive relief to prevent the City from enforcing its current ratemaking ordinance or tariff and from maintaining or enacting any other ratemaking ordinance or tariff that includes in retail rates the recovery of

---

[5] Strictly speaking, the City does not have a "return" on investment because its assets are funded not by investor-supplied capital but by debt. For the purpose of this appeal, we will treat the percentage of base-rate revenue that the City transfers to its general fund as a rough proxy for "return on investment." When we speak of the City's return or profit, we are referring to this amount.

6

any wholesale power-generation costs or a return or profit on the value of the assets used to provide wholesale service.

The requested relief could not resolve this dispute because the trial court lacks jurisdiction to render it. Where, as here, a utility is owned by a municipality, the municipality's governing body, or a body vested with the power to manage and operate the MOU, has exclusive jurisdiction to determine "whether to unbundle any energy-related activities." TEX. UTIL. CODE ANN. § 40.055(a)(2). As previously mentioned, "unbundling" refers to the separation of a utility's business activities into those of (a) power generation, (b) power transmission and distribution, and (c) retail provision of electricity. *See id.* § 39.051(b). "Structural" unbundling requires "a separation of personnel, information flow, functions, and operations." *Id.* § 39.051(d). An integrated utility instead can unbundle "functionally" by "separating out costs and rates" of power generation from the costs and rates of its other businesses. *Cf. Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 n.19 (Tex. 2007) ("[S]eparating out costs and rates for generation, transmission, and distribution operations is itself a functional unbundling.").[6] To require the City to separate recovery of wholesale costs from its calculation of retail rates would be to require the City to functionally unbundle its wholesale business activities from its retail business activities. Because exclusive jurisdiction over unbundling decisions rests with the City, the district court lacks jurisdiction to require the City to unbundle. *See* TEX. CONST. art. V, § 8 (granting district courts general jurisdiction "except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body").

---

[6] In that case, the MOU Texas Municipal Power Agency had long-standing "bundled" contracts to sell and transmit wholesale power directly to other MOUs.

Data Foundry asserts that the municipality's exclusive jurisdiction to decide whether and how to unbundle does not prevent the trial court from considering its claims because granting the requested relief "would affect only the amount, but not the structure, of the City's retail rates." But the trial court similarly lacks jurisdiction to change the amount charged for retail service. Fixing or revising a utility's rates is a legislative function, not a judicial one. *See Sw. Bell Tel. Co.*, 526 S.W.2d at 529–30. And just as the City has exclusive jurisdiction over the legislative decision of whether to unbundle, it has exclusive jurisdiction to "set all terms of access, conditions, and rates applicable to services provided by the [MOU]." TEX. UTIL. CODE ANN. § 40.055(a)(1). In matters over which the City has exclusive jurisdiction, the district court has none.

Data Foundry further asserts that the City already has partially unbundled, but the examples it cites do not support this characterization. For example, the City identifies the part of its retail rates that recover wholesale power-generation fixed costs separately from the part of its retail rates that recover wholesale power-generation variable costs.[7] These arguments appear to rest on the assumption that by identifying the components of its retail rates, the City has functionally unbundled

---

[7] Fixed costs of wholesale power-generation are included as a part of a retail ratepayer's base rate. The base rate includes "energy charges" and "demand charges." "Energy charges" are charges for electric service based upon the electric energy consumed or billed and are measured in kilowatt hours. "Demand charges" are charges based on the electric capacity the customer consumes and are measured in kilowatts. If a retail customer is a large business, its allocated portion of the fixed costs of power generation are included in the demand charges of its base rate. To save on the costs of demand metering, residential retail customers and small businesses pay their allocated portion of the fixed costs of power generation as part of the energy charges of their respective base rates. Data Foundry pleaded that because it pays its allocated share of the fixed costs of power generation through the demand-charge portion of its base rate, "[the City] has therefore 'unbundled' its 'energy' and 'demand' costs on the base rate side insofar as Plaintiff is concerned." Data Foundry similarly asserts that the City has "unbundled" its power-generation fixed costs from its power-generation variable costs because fixed costs are included in retail customers' base rates, as described above, while variable costs are passed through to retail customers on a dollar-for-dollar basis as a "Power Supply Adjustment."

them. We cannot agree. "Unbundling" requires that the business activities belonging to each of the three kinds of electrical-utility enterprises be separated, not merely that they be identified. Fixed costs of power generation are not "unbundled" from variable costs of power generation, because both are costs for the same enterprise—power generation.[8] And, the City's power-generation services are not "unbundled" from its provision of retail electricity because the City's power-generation costs and revenue are integrated into the City's retail rates.[9]

Because the City alone must choose whether to unbundle or to offer customer choice, the trial court lacks jurisdiction over Data Foundry's claims and requests for relief seeking a ruling that would prevent the City from enacting, maintaining, or enforcing a retail rate structure that includes recovery of wholesale expenses or a return on wholesale assets. These include the following claims and requests for relief:

1. Data Foundry's request for a declaration that, because the MOU's rates are designed to recover the City's wholesale power-generation expenses or a return on the City's wholesale power-generation capital assets, the retail rates are unjust, unreasonable, excessive, discriminatory, confiscatory, constitute a taking, and do not reflect a reasonable measure of use by, or benefit to, ratepayers; and thus, the City's ordinance approving the tariff is illegal and unenforceable;

_____

[8] Similarly, the part of retail base rates referred to as energy charges cannot be said to be "unbundled" from the part of retail base rates referred to as demand charges, because each is merely a component of the base rate charged in the single enterprise of providing retail electric service.

[9] Data Foundry also argues that the City has unbundled wholesale transmission costs from retail transmission costs. Retail transmission costs are bundled into the City's retail rates, but wholesale transmission costs necessarily are excluded because the Commission retains authority over wholesale transmission rates and ensures that an electric utility, including an MOU, "recovers the utility's reasonable costs in providing wholesale transmission services necessary for the transaction from the entity for which the transmission is provided so that the utility's other customers do not bear the costs of the service." TEX. UTIL. CODE ANN. § 35.004(c).

9

2.      Data Foundry's request for a declaration that wholesale costs are not allowable or reasonable and necessary operating expenses or eligible for base-rate treatment; and thus, the rates lead to an excessive and unreasonable return or profit on the fair value of the electric system's properties that are dedicated to, and used and useful for, the furnishing of retail electric service;

3.      Data Foundry's request for a declaration that the City Council acted arbitrarily and capriciously and abused its discretion by promulgating retail base rates that include the recovery of wholesale expenses or a return on wholesale assets, and thus, the City Council knew that the rates were designed to recover, and do recover, more than is required for the City to recover its reasonable and necessary expenses for the provision of retail electric service and obtain a reasonable return or profit on the capital assets that are used by, or useful to, captive retail electric customers;

4.      Data Foundry's request for a declaration that the purposeful effort to require the MOU's retail ratepayers to pay rates designed to recover costs related to wholesale power generation constitutes an illegal tax; and

5.      Data Foundry's request for an injunction enjoining the City's enforcement of the ordinance approving the tariff, and enjoining the enforcement of any other ratemaking ordinance or tariff, on the ground that the ordinance or tariff prescribes rates for retail electricity service designed to partially or wholly recover the City's power-generation costs through inclusion of those costs as operating expenses or by earning a return or profit on the value of the assets used to provide wholesale power-generation service.

To the extent that any other claims or requests for relief raised in Data Foundry's pleadings similarly are based on the premise that it is unlawful for the City to include recovery of wholesale costs or a return on wholesale power-generation assets in its calculation of retail rates, the trial court lacks jurisdiction over those claims as well. We affirm the trial court's dismissal of these claims.

10

**B.    Claims That Are Not Based on the Exclusion of Wholesale Costs**

Some of Data Foundry's claims that the City's retail rates are unlawfully high are not based on the City's inclusion of power-generation costs and a return on power-generation assets in the calculation of retail rates.  For example, Data Foundry claims that the City transfers 12% of its average base-rate revenue to its general fund, and that its debt-service coverage ratio is 2.36 times the amount of the City's electric utility bonds.  According to Data Foundry, these amounts are too high.[10]

The trial court has jurisdiction to consider these claims if standing requirements are satisfied, because a court can review a claim that an MOU's rates are exorbitant or that the amount of its return is so high as to violate the ratepayer's constitutional rights.  *See San Antonio Indep. Sch. Dist. v. City of San Antonio* ("*SAID*"), 550 S.W.2d 262, 265 (Tex. 1976).

### 1.    *Particularized injury*

The City argues that Data Foundry is asserting only a generalized injury for which it lacks standing, but the cases on which it relies do not support that position.  For example, in *Schenker v. City of San Antonio*, 369 S.W.2d 626 (Tex. App.—San Antonio 1963, writ ref'd n.r.e.), the appellate court dismissed a rate-challenge appeal on the grounds that "the plaintiffs had not exhausted their administrative remedies through petition to the City Council," and alternatively, that "the plaintiffs lacked justiciable interest to bring the suit" because, absent allegations of a special injury, "[o]nly lawfully constituted guardians of the public interest" may sue to redress injuries to the general public.  *SAISD*, 550 S.W.2d at 265.  The City also relies on

---

[10] Data Foundry also alleges that these amounts are higher still once wholesale power-generation costs are excluded, as Data Foundry believes is required.  To the extent that these claims depend on the exclusion of power-generation costs or a return on power-generation assets, the trial court lacks jurisdiction over the claims and properly dismissed them for the reasons previously explained.

11

*Concerned Community Involved Development, Inc. v. City of Houston*, 209 S.W.3d 666 (Tex. App.—Houston [14th Dist.] 2006, pet. denied), in which this court held that property owners had no standing to challenge the building of a bridge near—but not on, or restricting access to—their land. The court explained that the property owners had not alleged "any cognizable property interest that might be impacted by the City other than an unconstitutional taking of property," and that the property owners denied asserting a takings claim. *Id.* at 672.

Here, however, Data Foundry has alleged a particularized injury. It contends that the City is requiring it to pay unlawful charges, and Data Foundry has a cognizable property interest in its own money. *See Andrade*, 345 S.W.3d at 8 ("[W]here a harm is concrete, though widely shared, the Court has found injury in fact." (quoting *FEC v. Akins*, 524 U.S. 11, 24, 118 S. Ct. 1777, 141 L. Ed. 2d 10 (1998) (citation omitted))). Requiring a person to pay unlawful charges therefore results in "an actual grievance, not one that is merely hypothetical or generalized." *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004) (citing *Brown v. Todd*, 53 S.W.3d 297, 302 (Tex. 2001)). Because we conclude that Data Foundry has sufficiently alleged a particularized injury as to these claims, it is unnecessary to consider its arguments that no particularized injury was required.

### 2. *Statutory preemption*

The City next points out that the Public Utility Regulatory Act (PURA) allows a customer of an IOU or a non-resident customer of an MOU to appeal the setting of retail rates to the Commission, but the statute does not authorize an MOU's ratepayer who takes service inside the City's boundaries to appeal to the Commission. PURA is silent, however, on the question of whether judicial review is available to a ratepayer who takes service inside the City limits. The City argues that because PURA is a comprehensive statute, no remedies exist outside of it. But

the obligation to refrain from "exacting exorbitant or unreasonable charges . . . would be meaningless if there were no judicial redress for its violation." *Sw. Bell Tel.*, 526 S.W.2d at 529; *cf. R.R. Comm'n v. Hous. Nat. Gas Corp.*, 155 Tex. 502, 509, 289 S.W.2d 559, 563 (1956) (explaining that the size of return on investment is a matter of legislative judgment "so long as it is not confiscatory"). As the Supreme Court of Texas has explained, "Standing operates to prevent the Judiciary from exercising authority that belongs to other departments of government, not to deprive the Judiciary of its role in interpreting law . . . ." *Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 581 (Tex. 2013).

In sum, we conclude that Data Foundry has alleged a particularized injury from the City's alleged charging of unreasonably high rates due to an allegedly excessive rate of return or an allegedly excessive debt-service coverage ratio.[11] To the extent that those claims do not seek to prohibit the City from continuing to bundle wholesale power-generation costs and a return on power-generation assets into its calculation of retail rates, the trial court has jurisdiction to address those claims. We therefore reverse the portion of the judgment dismissing those claims for lack of standing.

## C. Claims That Are Not Necessarily Based on the Exclusion of Wholesale Costs

Data Foundry seeks a permanent injunction

> enjoining the City from maintaining or enacting a rate structure that fails to distinguish charges between customers using only judicially accepted factors such as the cost of service, the purpose for which the service or product is received, the quantity or amount received, the different character of the service furnished, the time of its use or any

---

[11] The remaining standing requirements—that the alleged injury is fairly traceable to the City's conduct and that there is a substantial likelihood that the requested declaration would redress the alleged injury—are satisfied, and the City does not contend otherwise.

other matter which presents a substantial difference as a ground of
distinction.

Data Foundry also seeks similar declaratory relief.

By these requests, Data Foundry may seek to prevent the City from including
in its retail rates recovery of wholesale expenses or a profit or return on wholesale
assets. To the extent that this is so, the trial court lacks jurisdiction to render the
requested relief for the reasons previously explained.

But, regardless of the basis of this request, and regardless of whether Data
Foundry correctly identifies the "judicially accepted factors" applicable to an MOU
under the facts alleged here, Data Foundry lacks standing for the additional reason
that this request runs afoul of the separation of judicial from legislative power. *See
id.*; *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008). "[S]tanding
doctrines reflect in many ways the rule that neither citizens nor taxpayers can appear
in court simply to insist that the government and its officials adhere to the
requirements of law." *Andrade*, 345 S.W.3d at 7 (quoting Charles Alan Wright, et
al., FEDERAL PRACTICE & PROCEDURE § 3531.10 (3d ed. 2008)). Because Data
Foundry lacks standing merely to insist that the City adhere to the law, and because
there is not a substantial likelihood that the vague relief requested will remedy an
alleged injury or resolve a real controversy between them, Data Foundry lacks
standing to pursue these claims. We accordingly affirm the trial court's dismissal of
these claims and requests for relief.

## IV. ALLEGEDLY DISCRIMINATORY RATES

A utility may not unjustifiably discriminate in its rates between similarly
situated persons. *See SAISD*, 550 S.W.2d at 264–65; *Sw. Bell Tel. Co.*, 526 S.W.2d
at 529; *cf. El Paso Elec. Co. v. Pub. Util. Comm'n of Tex.*, 917 S.W.2d 846, 864
(Tex. App.—Austin 1995, writ dism'd by agr.) (stating that unequal treatment is not

unlawfully discriminatory if there is "a substantial and reasonable basis" for the distinction). Data Foundry alleges that the City's retail rates are discriminatory for four reasons.

First, although the City recently reduced base rates generally, Data Foundry alleges that the City allocated too much of the base-rate reduction to residential and small-business customers and allocated too little to the rate classes covering Data Foundry's two data centers. But "[w]hether differences in rates between classes of customers are to be made, and, if so, the amount of the differences, are legislative rather than judicial questions, and are for the determination of the governing bodies of the municipalities." *Gillam v. City of Fort Worth*, 287 S.W.2d 494, 497 (Tex. App.—Fort Worth 1956, writ ref'd n.r.e.). Given the differences in the rate classifications of these customers, Data Foundry's claim is not that the City unjustifiably discriminates between "similarly situated" customers.

Second, Data Foundry alleges that the City's base-rate reductions went into effect on January 1, 2017, but that an increase in the pass-through regulatory charges assessed against the PS2 rate class became effective on November 1, 2016. Data Foundry does not complain of the increase in the regulatory charges that the PS2 rate class was required to pay, but of its timing. Due to the difference in the effective dates of the regulatory-charge increase and the base-rate reduction, the PS2 rate class was, for two months, the only rate class that experienced an overall increase in the cost of electricity. Nevertheless, the rate reduction was effective for all retail customers on the same day; thus, Data Foundry was treated the same as all other customers in that respect. And, unlike the base rate, the regulatory charge is passed through on a dollar-for-dollar basis, so that comparing the date of the regulatory charge's increase with the date of the base rate's reduction is to compare apples with

15

oranges. Data Foundry cannot craft a discrimination claim by combining the dates of dissimilar charges that serve different ends.

Third, Data Foundry alleges that it is not given enough credit for its data centers' high load factors, which means that the data centers consume electricity at a more constant rate than other customers. The City has a rate class that confers benefits on high load-factor users with a demand of at least 20 megawatts but does not have a separate rate class for high load-factor users with a lower demand such as Data Foundry. Here, too, Data Foundry does not allege a true discrimination complaint, for its two data centers are treated the same as others in those respective rate classes.

Fourth, Data Foundry contends that the rate classes covering its two data centers bear too large a share of power-generation expenses, and that even within those rate classes, the power-generation expenses have a greater impact on Data Foundry based on factors such as the amount of power it uses. For example, Data Foundry complains that the City allocates fixed power-generation costs among the various retail classes based on each class's individual contribution to the system's peak use in each of the twelve months of the year. According to Data Foundry, the City's stated rationale for using this method is that the City must have its power-generation plants ready to sell power year-round. Data Foundry asserts that this rationale does not justify using this method in setting retail rates, because the power the City generates must be sold wholesale through the ERCOT market rather than directly to retail customers. As previously explained, however, the City integrates its wholesale costs into its retail rates, and the trial court has no jurisdiction to require the City to do otherwise. Although the method may have a larger impact on Data Foundry based on its rate class and the amount of power it uses, the quantity of service is recognized as a proper factor for distinguishing among individual

16

customers or classes of customers. *See El Paso Elec. Co.*, 917 S.W.2d at 864. Thus, once again, Data Foundry has failed to allege that the City discriminates against it on an impermissible basis.

For the foregoing reasons, we conclude that the trial court did not err in dismissing Data Foundry's discrimination complaints.

## CONCLUSION

Because Data Foundry has alleged a particularized injury from the City's alleged charging of unreasonably high rates due to an unlawfully high rate of return or an unlawfully high debt-service coverage ratio, we reverse the dismissal of those claims to the extent that Data Foundry does not seek to prohibit the City from continuing to bundle wholesale power-generation costs and a return on power-generation assets into its calculation of retail rates. We affirm the trial court's judgment dismissing Data Foundry's remaining claims and requests for relief, and we remand the case for further proceedings consistent with this opinion.


/s/ Tracy Christopher
   Justice

Panel consists of Chief Justice Frost and Justices Christopher and Jewell.