# IN THE SUPREME COURT OF TEXAS

═══════════

No. 19-0475

═══════════

Data Foundry, Inc., Petitioner,

v.

City of Austin, Texas, Respondent

═══════════════

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

═══════════════

**Argued December 3, 2020**

Justice Huddle delivered the opinion of the Court.

The City of Austin, through its city council, sets the rates that Austin Energy, an electric utility owned by the City, charges to Austin residents for retail electric services. Data Foundry, Inc., an internet service provider, purchases electricity from Austin Energy for its facilities in Austin. Data Foundry alleges that the rates charged by the City are illegal, and it filed a lawsuit to challenge those rates. The City filed a motion to dismiss under Texas Rule of Civil Procedure 91a. The trial court granted the motion on the sole ground that Data Foundry lacked standing because it failed to allege it had suffered a particularized injury. The court of appeals concluded Data Foundry suffered a particularized injury sufficient to confer standing but affirmed the dismissal of Data Foundry's claims in part on other grounds. We conclude that Data Foundry has standing to bring its claims, and we remand the case to the trial court.

# I

Data Foundry is an internet service provider that operates data centers located within the boundaries of the City of Austin. The City owns and operates Austin Energy, an electric utility system, as authorized by statute. TEX. LOC. GOV'T CODE § 552.001(b). Like many utility systems, Austin Energy has traditionally operated as a monopoly; any City resident wishing to purchase electric services must obtain those services from Austin Energy. The City sets the rates that Austin Energy charges to retail customers through rate ordinances passed by the Austin City Council.

In 2016, Austin Energy proposed to change the retail rates it was charging for electric services. The City hired a hearing examiner to conduct a review of the proposed new rates. Several ratepayers, including Data Foundry, intervened and participated in the hearing process. Ratepayers were permitted to conduct discovery, provide testimony, and cross-examine witnesses at a public hearing. Data Foundry submitted briefs in which it argued, as it does here, that Austin Energy's proposed rate structure would result in rates that were unreasonable, unlawful, and confiscatory. In particular, Data Foundry asserted that it was improper for Austin Energy to recoup losses resulting from its power-generation operations (over $200 million, according to Data Foundry) through the rates it charges to captive retail customers. Ultimately, the Austin City Council rejected Data Foundry's arguments and passed an ordinance establishing new "base" charges and various "pass-through" charges that Austin Energy would charge to retail customers of electric services.

Data Foundry sued in district court, seeking declarations that (1) the ordinance is "illegal and unenforceable" because the rates prescribed therein are "unjust, unreasonable, excessive, discriminatory, constitute a taking, are confiscatory and do not reflect a reasonable measure of use by or benefit to ratepayers"; (2) the rates lead to "an excessive and unreasonable return or profit";

2

(3) the Austin City Council acted arbitrarily and capriciously and abused its discretion by promulgating the rates; (4) the rates are discriminatory; and (5) the rates constitute an illegal tax. Data Foundry also sought to enjoin enforcement of the ordinance.

The City filed a motion to dismiss all of Data Foundry's claims under Rule 91a.[1] The City asserted two grounds for dismissal: (1) Data Foundry failed to allege a particularized injury sufficient to confer standing; and (2) alternatively, Data Foundry's claims have no basis in law. The trial court granted the City's motion and dismissed the suit. The court's dismissal order states the motion was granted on the ground that Data Foundry lacked standing to assert its claims. Data Foundry appealed.

The parties' briefs in the court of appeals focused on the trial court's holding that Data Foundry lacked standing because it failed to allege it had suffered a "particularized injury." However, Amici Curiae CPS Energy and Texas Public Power Association submitted in the court of appeals a brief in which they asserted the Public Utility Regulatory Act (PURA)[2] "supersedes any common law rules regarding whether and how courts review municipal utility rates." Amici argued that, under PURA, resident ratepayers have no basis for seeking judicial review of the rates set by a municipally owned utility. Amici also argued that Data Foundry's suit, if allowed to proceed, would require the courts to interfere with decisions that are exclusively within the control of the City. In particular, they argued Data Foundry's suit, if successful, would bar the City from adopting retail rates designed to recover its power-generation costs, and doing so would impermissibly force the City to "unbundle" Austin Energy's retail operations from its generation

---

[1] Rule 91a provides that, subject to certain exceptions not applicable here, "a party may move to dismiss a cause of action on the grounds that it has no basis in law or fact." TEX. R. CIV. P. 91a.1.

[2] TEX. UTIL. CODE §§ 11.001–66.016.

operations. To put this argument in proper context requires a brief discussion of the relevant statutes.

Before electricity can be furnished to customers, it must be produced, generated, transmitted, distributed, and ultimately sold to the customer. Electric utility companies traditionally have operated as monopolies in the areas they serve, providing all these services for a particular municipality or other geographic area. *See* TEX. UTIL. CODE § 31.001(b). In 1999, however, the Texas Legislature made sweeping changes to the Texas Utilities Code with the purpose of restructuring certain electric utility services. *See generally* Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543. Among other things, the 1999 amendments required each "electric utility" to "unbundle," that is, to separate its business activities into three separate units: a power generation company, a retail electric provider, and a transmission and distribution utility. *Id.* § 39 (codified at TEX. UTIL. CODE § 39.051(b)).

Significantly, however, municipally owned utilities (such as Austin Energy) are excluded from this unbundling mandate. *See* TEX. UTIL. CODE § 40.001(a) (stating that, with respect to municipally owned utilities, Chapter 40 controls over any other Utilities Code provision, except where the term "municipally owned utility" is specifically used); *see also id.* § 31.002(6) (excluding municipal corporations from the definition of "electric utility"). Chapter 40 gives the municipal governing body of a municipally owned utility "exclusive jurisdiction" to "determine whether to unbundle any energy-related activities and, if the municipally owned utility chooses to unbundle, whether to do so structurally or functionally." *Id.* § 40.055(a)(2).

The City of Austin has not chosen to unbundle Austin Energy's energy-related activities, nor is it obligated to do so. However, amici argued in the court of appeals that Data Foundry's

4

requested relief would require Austin Energy to unbundle, and thus would impermissibly encroach on the City's exclusive jurisdiction over that decision. In their briefs in this Court, the parties dispute what it means to "unbundle" under section 40.055 (at least "functionally"). They also disagree whether this suit's resolution in Data Foundry's favor would require Austin Energy to unbundle its energy-related activities.

While amici couched these arguments in the court of appeals as implicating Data Foundry's standing, Data Foundry filed a brief in response asserting that these arguments actually raise a separate question of exclusive jurisdiction—whether PURA deprived the trial court of jurisdiction to resolve the merits of Data Foundry's claims. In response to questions from the court of appeals panel regarding this issue, Data Foundry filed a letter brief asserting that, because this question implicates the case's merits, it was not yet ripe for consideration. Data Foundry also argued that the extent to which its claims may implicate matters within the City's exclusive jurisdiction was overstated, and it asserted it was nonetheless entitled to judicial review of the City's ordinance because Data Foundry had exhausted its administrative remedies by participating in the City's rate-making proceedings. The City filed a responsive letter brief in which it largely adopted amici's arguments that Data Foundry was seeking a remedy the courts cannot provide because the decision whether to unbundle is within the City's exclusive jurisdiction.

The court of appeals reversed the trial court's dismissal of the suit in part and affirmed in part. 575 S.W.3d 92, 104 (Tex. App.—Houston [14th Dist.] 2019). The court rejected the City's argument that Data Foundry failed to allege a particularized injury to establish it had standing to assert its claims. *Id.* at 101. The court concluded that, because Data Foundry had a cognizable property interest in its own money, Data Foundry's allegation that it was required to pay Austin

5

Energy unlawful charges was a concrete and particularized injury. *Id.* However, the court affirmed the dismissal of Data Foundry's claims to the extent they challenged matters that, according to the court of appeals, fell within the City's exclusive jurisdiction under PURA. *Id.* at 99–100. The court also affirmed the dismissal of Data Foundry's discrimination claims. *Id.* at 103–04. Both parties petitioned for review.

## II

### A

We begin our analysis by addressing the issue on which the trial court based its ruling: whether Data Foundry has alleged a particularized injury sufficient to confer standing to pursue its claims. "[A] plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority . . . ." *Coastal Liquids Transp., L.P. v. Harris Cty. Appraisal Dist.*, 46 S.W.3d 880, 884 (Tex. 2001) (quoting *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996)). Standing requires "a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court." *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 154 (Tex. 2012). As we have repeatedly recognized, a plaintiff does not lack standing simply because some other legal principle may prevent it from prevailing on the merits; rather, a plaintiff lacks standing if its "claim of injury is too slight for a court to afford redress." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 305 (Tex. 2008). The threshold inquiry into standing "in no way depends on the merits of the [plaintiff's] contention that particular conduct is illegal." *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 7 (Tex. 2011) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990), and *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

6

We have adopted the federal requirements for standing as set forth by the United States Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). *See Heckman*, 369 S.W.3d at 154–55. To maintain standing, a plaintiff must show: (1) an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the defendant's challenged action; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* (citing *Lujan*, 504 U.S. at 560–61).

The City's motion to dismiss challenged the first of these requirements, asserting that Data Foundry failed to establish it has suffered a particularized injury. An injury is "particularized" for standing purposes if it "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1). As a City resident, Data Foundry is required to pay to the City and its municipally owned utility, Austin Energy, a rate that Data Foundry alleges to be illegal and discriminatory. Data Foundry thus alleges an injury that is particularized to it—Data Foundry suffers financial harm because it must pay Austin Energy a particular sum of money that exceeds what Data Foundry contends it should have to pay. The fact that the City's actions may also injure other residents does not preclude a finding that Data Foundry has alleged a sufficiently particularized injury. *See Spokeo*, 136 S. Ct. at 1548 n.7; *Andrade*, 345 S.W.3d at 7.

## B

The City nevertheless argues that Data Foundry's "mere status as a ratepayer" is insufficient to confer standing on a party challenging a generally applicable municipal rate ordinance. In support, the City relies on *South Texas Water Authority v. Lomas*, 223 S.W.3d 304

(Tex. 2007). In *Lomas*, a resident of the City of Kingsville and a non-profit association organized by city residents sued to challenge Kingsville's water-supply contract with the South Texas Water Authority. *Id.* at 305–06. The *Lomas* plaintiffs alleged the water-supply contract—to which they were not parties—was "misapplied," causing Kingsville ratepayers to bear a disproportionate share of the operating expenses of service compared to users residing in other areas serviced by the Authority. *Id.* at 306, 308. This Court held the plaintiffs failed to demonstrate standing as third-party beneficiaries of the water-supply contract because the contract conferred no third-party rights upon them. *Id*. at 306–07. *Lomas* also rejected the plaintiffs' claim that their status as citizens and ratepayers sufficed to create standing. *Id.* at 307–08. The critical difference between *Lomas* and this case is that the *Lomas* plaintiffs did not allege they were discriminated against by the city or the Authority or forced by them to pay illegal rates. Instead, the *Lomas* plaintiffs complained about the rates the Authority charged *the city*. Their alleged injury was thus derivative of the alleged injury to the city. Accordingly, Lomas failed to allege he "suffered an injury peculiar to himself." *Id.* at 307. In contrast, Data Foundry has suffered an injury peculiar to itself, in that it alleges the rates *it* must pay to Austin Energy are discriminatory and otherwise illegal.

In the context of lawsuits filed by ratepayers to challenge utility rates charged by a municipality, we have not required an individual plaintiff to allege its injury is distinct from injuries other ratepayers may suffer. We addressed this issue, although somewhat obliquely, in *San Antonio Independent School District v. City of San Antonio*, 550 S.W.2d 262 (Tex. 1976) ("*SAISD*"). *SAISD* involved an attack by several school districts and other entities on the rates being charged by the City of San Antonio for gas and electricity sales. *Id.* at 262. The trial court

entered judgment for the plaintiffs, but the court of appeals reversed. *Id.* at 262–63. We affirmed the court of appeals, holding that the specific challenges asserted by the plaintiffs failed on the merits. *Id.* at 267. In so doing, however, we expressly noted that the plaintiffs in that case did not contend the city had obtained an unreasonable return from its investment. *Id.* at 262. We stated that "[u]pon proper pleading and record, if the City's return were proved to be excessive and unreasonable, the courts could grant relief." *Id.* at 265.

We then discussed "[t]he question of the justiciable interest required for a party to seek judicial intervention against excessive [city] utility rates." *Id.* We stated that this question had been addressed in *Schenker v. City of San Antonio*, 369 S.W.2d 626 (Tex. App.—San Antonio 1963, writ ref'd n.r.e.). In *Schenker*, a group of plaintiffs sued the City of San Antonio, challenging the reasonableness of electric and gas rates charged by the city. *Id.* at 627. The trial court dismissed the plaintiffs' suit, and the court of appeals affirmed. *Id.* at 630. As we noted in *SAISD*, the dismissal in *Schenker* was affirmed on two separate grounds: (1) because the plaintiffs had not exhausted their administrative remedies through the city council, and (2) because the plaintiffs lacked a justiciable interest to bring the suit. *SAISD*, 550 S.W.2d at 265; *see Schenker*, 369 S.W.2d at 629–30. With respect to the second ground, the *Schenker* court said the plaintiffs had no justiciable interest to complain of excessive rates charged to all consumers. 369 S.W.2d at 630. Although we did not expressly reject this argument in *SAISD*, we noted that we had recognized an individual ratepayer's discrimination claim against a city in *City of Texarkana v. Wiggins*, 246 S.W.2d 622 (Tex. 1952), and we stated that "[m]any other jurisdictions have permitted consumer suits attacking excessive charges or discrimination by municipal utilities." *SAISD*, 550 S.W.2d at 265.

9

In support of its conclusion that an individual ratepayer had no justiciable interest to challenge an excessive rate charged to all customers, the *Schenker* court relied on *San Antonio Conservation Society v. City of San Antonio*, 250 S.W.2d 259 (Tex. App.—Austin 1952, writ ref'd). But that suit did not involve an action by ratepayers. Instead, *San Antonio Conservation Society* involved a group of plaintiffs who sought to enjoin the construction of a bridge across the San Antonio River. *Id.* at 260. The only alleged injury was to the plaintiffs' alleged right to "enjoy the charm and beauty of the San Antonio River." *Id.* at 263. The court of appeals held (and we agreed)[3] that any such alleged injury was not concrete and particular to any plaintiff, but was amorphous and could only be sustained "in common with the general public." *Id.* In contrast, being forced to part with one's money to pay an excessive electric rate is an injury that is personal and individual, even though others may suffer the same injury. *See Spokeo*, 136 S. Ct. at 1548 n.7.

The City also relies on *Tuck v. Texas Power & Light Co.*, 543 S.W.2d 214 (Tex. App.—Austin 1976, writ ref'd n.r.e.), but the holding in that case is incompatible with this Court's jurisprudence on standing. In *Tuck*, the court of appeals affirmed the dismissal of a city resident's challenge to a city's electric rates as excessive and unlawful. *Id.* at 214. The court noted that, unlike this case, the ratepayer did not claim the rates were discriminatory. *Id.* at 215. With little analysis, it held that the plaintiff lacked standing because he "did not plead any damage peculiar to himself and not in common with every electric utility user" in the city. *Id.* In support of this holding, the court cited *Schenker*. *Id.* As noted above, we implicitly rejected the language from

---

[3] Cases where an application for writ of error was filed after 1927 bearing the notation "refused" "carr[y] the imprimatur of Texas Supreme Court precedent." *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 754 n.52 (Tex. 2006).

10

*Schenker* that a plaintiff has no justiciable interest to sue for excessive rates charged to all customers in *SAISD*, *see* 550 S.W.2d at 265, and we expressly reject it now.

The *Tuck* court also cites as support two related "writ refused" cases from another court of appeals. 543 S.W.2d at 215. However, those cases both involve the same situation present in *Lomas*: a city resident seeking to challenge the terms of a contract between the city and a third party. *See Hazelwood v. City of Cooper*, 87 S.W.2d 776, 776 (Tex. App.—Texarkana 1935, writ ref'd); *Jenkins v. City of Cooper*, 87 S.W.2d 778, 779 (Tex. App.—Texarkana 1935, writ ref'd). Neither of these cases supports a conclusion that an aggrieved ratepayer lacks standing because other ratepayers are similarly aggrieved.

To the extent that *Tuck* or *Schenker* (or any other decision) may be read as holding that a utility ratepayer cannot establish standing to sue unless it alleges an injury different from that of other ratepayers, beyond its personal obligation to pay a rate that it claims is improper, we disapprove of those cases as inconsistent with our standing jurisprudence. By alleging it was required to pay a rate for electric services to Austin Energy that was unreasonable, excessive, discriminatory, and confiscatory, Data Foundry's petition satisfied the standing requirement of a particularized injury.

## III

While the court of appeals correctly determined that Data Foundry's petition satisfied the particularized-injury requirement, the court nevertheless affirmed the trial court's dismissal of some, but not all, of Data Foundry's claims. The court of appeals divided Data Foundry's claims into two broad categories: (1) allegations that the City's rates were unreasonable and excessive, and (2) allegations that the City's rates were discriminatory. 575 S.W.3d at 97. The court of

11

appeals further divided the first category and held the trial court lacked jurisdiction to resolve these claims to the extent they "are based on the premise that it is unlawful for the City to include recovery of wholesale costs or a return on wholesale power-generation assets in its calculation of retail rates." *Id.* at 100. Rather, the court held the trial court could exercise jurisdiction over the excessive-rate claims only to the extent they do not rest on an attempt to exclude the City's power-generation costs or a return on its power-generation assets from the rates charged. *Id.* at 102. With respect to discrimination claims, the court of appeals affirmed the dismissal, apparently concluding that Data Foundry had failed to assert a "true" discrimination complaint. *Id.* at 103–04. We address each of these issues in turn.

**A**

### *Claims that the City's rates are unreasonable and excessive*

The court of appeals divided Data Foundry's excessive-rate claims into two sub-categories. The first consists of claims alleging the City's rates are excessive and unreasonable because the City included the recovery of its wholesale power-generation costs and a return on its power-generation assets in calculating its rates. *Id.* at 97. The second consists of all other claims alleging the City's rates are excessive. *Id.* at 100. According to the court of appeals, the trial court lacked jurisdiction to resolve any claim that falls within the first sub-category because adjudicating claims that involve the propriety of passing generation costs onto ratepayers would require a court to determine a dispute over which the City has exclusive jurisdiction—specifically, whether the City should be required to "unbundle" its power-generation activities from its other business activities, including retail sales. *Id.* at 99–100.

The court of appeals reasoned that "[i]n matters over which the City has exclusive jurisdiction, the district court has none." *Id.* at 99. It thus held that the City's exclusive jurisdiction over the decision whether to unbundle deprived the trial court of jurisdiction to review the City's rates. *Id.* at 99–100. Data Foundry contends that, even if the resolution of its claims involved matters within the City's exclusive jurisdiction, the trial court would still have jurisdiction to review the City's rates because Data Foundry exhausted its administrative remedies through its participation in the City's hearing process. The court of appeals did not address this exhaustion argument.

The trial court's dismissal was based solely on a determination that Data Foundry lacked standing because it failed to allege a particularized injury. For the reasons explained above, we agree with the court of appeals that the trial court's conclusion on standing was erroneous. But, at this early stage of the litigation and in the context of a Rule 91a motion, the court of appeals should have considered only the standing issue on which the trial court ruled and not reached an issue neither ruled on by the trial court nor adequately developed in the trial court or in the court of appeals. Doing so led the court of appeals to adjudicate aspects of Data Foundry's claims prematurely.

The exclusive-jurisdiction issue, including Data Foundry's exhaustion argument, is distinct from the question of whether Data Foundry has standing. A challenge to a party's standing is an attack on the party's ability under the United States and Texas Constitutions to assert a claim. In Texas, the standing requirement stems from two constitutional limitations on subject-matter jurisdiction. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993). The first limitation is the separation-of-powers doctrine under both the federal and state

13

constitutions. *Id.* at 444; *see* TEX. CONST. art. II, § 1; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 471–74 (1982). Under the separation-of-powers doctrine, courts are prohibited from issuing advisory opinions, because doing so invades the function of the executive rather than judicial department. *Tex. Ass'n of Bus.*, 852 S.W.2d at 444.

The second constitutional limitation on a court's subject-matter jurisdiction is the open-courts provision of the Texas Constitution. *Id.* at 444; *see* TEX. CONST. art. I, § 13. That provision states that all courts shall be open, and every person shall have remedy by due course of law, "for an injury done" to that person. TEX. CONST. art. I, § 13.

For these reasons, a challenge to standing turns on the plaintiff's claimed injury: whether the alleged injury is both concrete and particularized and actual or imminent, not conjectural or hypothetical; whether the alleged injury is fairly traceable to the defendant's challenged action; and whether it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Heckman*, 369 S.W.3d at 154–55 (citing *Lujan*, 504 U.S. at 560–61).

There may be other impediments to a court's jurisdiction—perhaps including the City's claim that resolving this dispute would interfere with the City's exclusive jurisdiction—but those alleged impediments are not challenges to the plaintiff's standing. *See Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 774 (Tex. 2020). The City's assertion that a resolution of this dispute would interfere with the City's exclusive jurisdiction does not implicate Data Foundry's standing. In addition, the trial court did not pass on this exclusive-jurisdiction issue or any exhaustion issues, nor were they adequately developed in the court of appeals. The parties' briefs in the court of appeals addressed the exclusive-jurisdiction dispute, including the exhaustion question, only as an afterthought after it was raised by amici. No court has analyzed whether Data Foundry's claim

14

that the doctrine of exhaustion of administrative remedies applies and was satisfied in this case, which would involve at least some factual development.

The parties should have an opportunity to develop these arguments in the trial court, and the trial court should have an opportunity to determine whether and to what extent it has or lacks jurisdiction over Data Foundry's claims based on a record developed for that purpose. We reverse that portion of the court of appeals' judgment affirming the dismissal of this sub-category of Data Foundry's claims, and we remand to the trial court for further proceedings.

B

### *Claims that the City's rates are discriminatory*

The court of appeals affirmed the trial court's dismissal of Data Foundry's claims that the City's rates are discriminatory. 575 S.W.3d at 102–04. In part, the court determined that Data Foundry "does not allege a true discrimination complaint" and concluded that Data Foundry failed to allege discrimination "on an impermissible basis." *Id.* at 103–04.

The court of appeals presumably reached these conclusions because it agreed with the portion of the City's Rule 91a motion in which the City argued Data Foundry's alleged discrimination claims had no basis in law. *See* TEX. R. CIV. P. 91a.1. But the trial court expressly based its dismissal order solely on the ground that Data Foundry lacked standing. The City never asserted in the court of appeals that the court should affirm the trial court's judgment on any alternative grounds. Accordingly, the court of appeals erred in affirming the dismissal of Data Foundry's discrimination claims on this basis.

Likewise, to the extent the court of appeals concluded the City's exclusive jurisdiction over unbundling deprived the trial court of jurisdiction to provide Data Foundry's requested relief for

alleged discrimination, this determination was not properly before the court of appeals. As discussed above, the trial court should first make that determination based on a properly developed record.

## IV

Finally, the City asks us to conclude that, by enacting PURA, the Legislature intended that city residents such as Data Foundry no longer have any judicial remedy when a municipally owned utility charges a rate that is alleged to be unreasonable or discriminatory. Essentially, the City argues that PURA has preempted the common law and precludes Data Foundry's requested judicial remedy. Yet the City frames this argument as one of standing, asserting that PURA precludes Data Foundry from having "standing to sue the City."

Before PURA's enactment, we recognized that, while the setting of utility rates is strictly a legislative function, courts may review challenges to those rates to determine if they are unreasonable or discriminatory. *See SAISD*, 550 S.W.2d at 265 ("The courts should, however, pass upon the unreasonableness of the rates of a municipally owned utility (set by that municipality) in order to protect the utility customers from being unfairly burdened with the costs of city government."); *Wiggins*, 246 S.W.2d at 625, 628 (relying on "the broad common-law principle that a municipality may not unreasonably discriminate in rates and charges" and concluding that a discriminatory rate ordinance was void unless the municipality could establish in court some reasonable basis for the difference in rates). However, the City argues (1) PURA created a pervasive regulatory scheme that preempts the common law on this issue; and (2) with respect to municipally owned utilities, the Legislature created a specific procedure for an

administrative appeal to the Public Utility Commission by non-city residents,[4] but because it provided no such procedure for an administrative appeal by city residents, the Legislature intended that city residents would have no judicial recourse. Data Foundry responds that the City's argument must be analyzed under *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422 (Tex. 2017), in which we held that abrogation of a common-law claim by statute "is disfavored and requires a clear repugnance" between the common-law cause of action and the statutory remedy. *Id.* at 428 (quoting *Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000)). Data Foundry contends the City failed to demonstrate either that PURA expressly abrogated Data Foundry's common-law claims or that there is a clear repugnance between those claims and the statute.

The City's Rule 91a motion did not assert preemption as a basis for dismissal. Neither party raised or discussed this preemption argument in their principal briefs or post-submission briefing in the court of appeals.[5] And the City's briefing in this Court improperly frames its argument as one of standing. Accordingly, we decline the City's invitation to address whether the trial court could have properly dismissed Data Foundry's claims based on PURA preemption, and we express no opinion on this issue. Our decision does not preclude the City from raising this argument in the trial court on remand.

\* \* \*

We conclude that Data Foundry has standing to bring its claims, and the trial court erred by dismissing Data Foundry's common-law and constitutional claims challenging the City's

---

[4] TEX. UTIL. CODE § 33.101.

[5] The only discussion of preemption in the court of appeals was in the amicus brief submitted by CPS Energy and Texas Public Power Association.

electric rates as unreasonable, excessive, confiscatory, and discriminatory.  The court of appeals correctly reversed and remanded some of Data Foundry's claims, but it erred by affirming portions of the trial court's judgment on other grounds.  We reverse the court of appeals' judgment in part and affirm in part, and we remand all of Data Foundry's claims to the trial court for further proceedings.

_____
Rebeca A. Huddle
Justice

**OPINION DELIVERED**: April 9, 2021